## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BONITA M. BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No.:  1:06-CV-01417 (RWR) |
| | ) | |
| **GEORGETOWN UNIVERSITY HOSPITAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT GEORGETOWN UNIVERSITY HOSPITAL'S
## MOTION FOR SUMMARY JUDGMENT

Keith J. Harrison, Esq.
Daniel M. Creekman, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500
(202) 628-5116 (facsimile)

*Counsel for Defendant*

Dated:  March 12, 2008

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................ iv

I. INTRODUCTION .........................................................................................1

II. SUMMARY OF ARGUMENT ....................................................................2

III. STATEMENT OF MATERIAL UNDISPUTED FACTS .......................3

    A.    Plaintiff Was An At-Will Employee Of Georgetown University Hospital. ............3

    B.    Plaintiff's Employment At The Hospital Was Plagued With Disciplinary Problems. .........................................................................................4

    C.    Plaintiff's Schedule Was Changed To Meet The Needs Of The Unit's Patients. ...............................................................................................5

    D.    On May 25, 2005, Plaintiff Attended A Staff Meeting Where Communications On The Unit Were Discussed. ...................................5

    E.    On May 25 And 26, 2005, Plaintiff Engaged In Gross Misconduct And Rude Behavior With Patients. ...............................................................7

    F.    Based On Two Separate Incidents Of Gross Misconduct, Plaintiff Was Suspended With Pay Pending Investigation. .......................................8

    G.    Plaintiff Admits That She Has No Basis To Believe That She Was Suspended Due To Her National Origin. .............................................8

    H.    Plaintiff Admits That She Repeatedly Refused To Meet with Ms. Humphrey To Discuss Her Annual Performance Evaluation. ...............9

    I.    Plaintiff Takes FMLA Leave After Refusing To Meet With Her Supervisor. .......................................................................................11

    J.    While Out On FMLA Leave, Plaintiff Worked Full-Time At Another Healthcare Facility. .............................................................................11

    K.    Plaintiff Resigned In Writing Her Position At the Hospital In Lieu Of Returning From Her FMLA Leave. ...................................................12

    L.    Plaintiff Filed An EEOC Compliant That Only Alleged "Reverse" National Origin Discrimination. ........................................................13

M.     On August 10, 2006, Plaintiff Filed A Claim In Federal Court, Raising For The First Time, Claims Of Discrimination Based On Race And Retaliation. ...........................................................................................13

N.     Plaintiff Admits That Her Retaliation Claim Is Based On Personal Issues With Her Supervisor And Not Statutorily Protected Activity. .............................14

O.     Plaintiff Admits That Her Breach Of Contract Claim Is Based On Her Union's Collective Bargaining Contract. ..............................................................15

P.     Plaintiff Admits That Her Emotional Distress Claim Is Based On Events That Occurred In The Context Of Her Employment. ...........................................15

IV. STANDARD OF REVIEW ...........................................................................................15

V. ARGUMENT ...................................................................................................................16

A.     Summary Judgment Must Be Granted As To Plaintiff's Claim Under Article 49(B) Of The Annotated Code Of Maryland Because Maryland Law Does Not Apply. ............................................................................................16

B.     Because Plaintiff Failed To Exhaust Her Administrative Remedies, This Court Does Not Have Jurisdiction To Hear Her Racial Discrimination And Retaliation Claims. ..................................................................................................17

C.     Plaintiff's Reverse National Origin Discrimination Claim Must Fail, As A Matter of Law. .......................................................................................................19

     1.     Plaintiff Has Failed to Demonstrate a *Prima Facie* Case of National Origin Discrimination. ...............................................................20

          a.     Plaintiff Cannot Satisfy the Higher Burden of Proving Reverse Discrimination. .......................................................20

          b.     Plaintiff has failed to demonstrate that she suffered any adverse employment actions. .......................................................22

          c.     None of the circumstances surrounding the "adverse actions" give rise to an inference of discrimination. .....................25

     2.     Had Plaintiff Established A *Prima Facie* Case, The Hospital Has Asserted A Legitimate Non-Discriminatory Reason For Its Discipline Of Plaintiff That Was Not Pretextual. .....................................26

          a.     The Hospital has asserted a legitimate non-discriminatory reason for its change of Plaintiff's schedule. ...............................27

          b.     The Hospital had a legitimate non-discriminatory reason to suspend Plaintiff pending the investigation of Plaintiff's treatment of Patient G. and his family. ...........................................28

c.    The Hospital had a legitimate non-discriminatory reason for removing Plaintiff from the  schedule......................................29

D.    Plaintiff Has Failed To State A Claim for Race Discrimination As A Matter Of Law...........................................................................................31

E.    Plaintiff Has Failed To State A Claim For Retaliation Because She Did Not Engage In A Protected Activity. ...................................................33

F.    Plaintiff's Wrongful Termination Claim Must Be Dismissed Because She Resigned..........................................................................................35

G.    Plaintiff, An At-Will Employee, Has Failed To Produce Evidence Of Any Contract Breach. ...................................................................................36

H.    The Facts Plaintiff Alleges Are Insufficiently Outrageous, As A Matter Of Law, To State A Claim For Intentional Infliction Of Emotional Distress.............37

CONCLUSION...................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adams v. George W. Cochran & Co., Inc.*,
597 A.2d 28 (D.C. 1991) ................................................................................ 36

*Allis-Chalmers Corp. v. Lueck*,
471 U.S. 202 (1985) ...................................................................................... 37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................... 16

*Bowden v. United States*,
106 F.3d 433 (D.C. Cir. 1997) ...................................................................... 17

*Brodetski v. Duffey*,
141 F. Supp. 2d 35 (D.D.C. 2001) ................................................................ 24

\* *Brown v. Brody*,
199 F.3d 446 (D.C. Cir. 1999) .......................................................... 20, 22, 23, 33

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998) ................................................................................ 22, 23

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006) ........................................................................................ 33

*Caldwell v. Servicemaster Corp.*,
966 F. Supp. 33 (D.D.C. 1997) ..................................................................... 17

*Catrett v. Johns-Manville Sales Corp.*,
826 F.2d 33 (D.C. Cir. 1987), *cert. denied, Celotex Corp. v. Catrett*, 484 U.S.
1066 (1988) ................................................................................................... 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................... 15

*Childers v. Slater*,
44 F. Supp. 2d 8 (D.D.C. 1999) ............................................................... 23, 24

*Church of Scientology Int'l v. Eli Lilly & Co.*,
848 F. Supp. 1018 (D.D.C. 1994) ................................................................. 16

*Daisley v. Riggs Bank, N.A.*,
372 F. Supp. 2d 61 (D.D.C. 2005) ................................................................ 36

\* Cases on which Defendant chiefly relies.

*Dale v. Thomason*,
  962 F. Supp. 181 (D.D.C. 1997).................................................................. 38

*Fairchild v. Forma Scientific, Inc.*,
  147 F.3d 567 (7th Cir. 1998) .................................................................... 32

*Forkkio v. Powell*,
  306 F.3d 1127 (D.C. Cir. 2002)............................................................ 22, 23

*Frazier v. University of Dist. of Columbia*,
  742 F. Supp. 28 (D.D.C. 1990) .................................................................. 36

*George v. Leavitt*,
  407 F.3d 359 (D.C. Cir. 2005).................................................................... 25

*Hairsine v. James*,
  517 F. Supp. 2d 301 (D.D.C. 2007)............................................................. 21

*Harding v. Gray*,
  9 F.3d 150 (D.C. Cir. 1993) ....................................................................... 21

*Hitchcock v. United States*,
  665 F.2d 354 (D.C. Cir. 1981).................................................................... 16

*Holcomb v. Powell*,
  433 F.3d 889 (D.C. Cir. 2006).................................................................... 27

*Kerrigan v. Britches of Georgetowne, Inc.*,
  705 A.2d 624 (D.C. 1997) .......................................................................... 38

*Lemmons v. Georgetown Univ. Hosp.*,
  431 F. Supp. 2d 76 (D.D.C. 2006).............................................................. 33

*  *Mastro v. PEPCO*,
  447 F.3d 843 (D.C. Cir. 2006)......................................................... 20, 21, 27

*Neuren v. Adduci, Mastriani, Meeks & Schill*,
  43 F.3d 1507 (D.C. Cir. 1995)................................................................... 26

*Nolting v. Nat'l Capital Group, Inc.*,
  621 A.2d 1387 (D.C. 1993) ........................................................................ 36

*Owens v. Nat'l Med. Care, Inc.*,
  337 F. Supp. 2d 131 (D.D.C. 2004)............................................................. 36

*Park v. Howard Univ.*,
  71 F.3d 904 (D.C. Cir. 1995)...................................................................... 17

*Peltier v. USA,*
   388 F.3d 984 (6th Cir. 2004) ............................................................. 24

*Robertson v. Snow,*
   404 F. Supp. 2d 79 (D.D.C. 2005) ..................................................... 24

*Robinson-Reeder v. Am. Council on Educ.,*
   2008 U.S. Dist. LEXIS 5979 (D.D.C. 2008) ................................. 17, 18

*Russell v. Principi,*
   257 F.3d 815 (D.C. Cir. 2001) ........................................................... 20

*Schmidt v. Chao,*
   2006 U.S. Dist. LEXIS 38870 (D.D.C. 2006) .................................... 32

\* *Sisay v. Greyhound Lines, Inc.,*
   34 F. Supp. 2d 59 (D.D.C. 1998) ................................................. 17, 18

*Taylor v. Small,*
   350 F.3d 1286 (D.C. Cir. 2003) ............................................. 20, 22, 33

\* *Thompson v. Jasas Corp.,*
   212 F. Supp. 2d, 21 (D.D.C. 2002) ......................................... 3, 38, 39

*Vaca v. Sipes,*
   386 U.S. 171 (1967) ........................................................................... 37

*Wade v. WMATA,*
   2005 U.S. Dist. LEXIS 12972 (D.D.C. 2005) .................................... 38

*Walker v. Dalton,*
   94 F. Supp. 2d 8 (D.D.C. 2000) .................................................... 27, 32

*Walker v. WMATA,*
   103 F. Supp. 2d 24 (D.D.C. 2000) ..................................................... 23

*Wiley v. Glassman,*
   511 F.3d 151 (D.C. Cir. 2007) ........................................................... 33

*Willingham v. Gonzales,*
   391 F. Supp. 2d 52 (D.D.C. 2005) ..................................................... 26

## Rules

Fed. R. Civ. P. 56(c) .............................................................................. 17

## Other Authorities

Restatement (Second) of Conflict of Laws § 146, Comt. e (1971) .............. 17

# I.

## <u>INTRODUCTION</u>

Plaintiff, an insubordinate employee who resigned after she was already working full-time in another job, has brought a barrage of claims, none of which can survive summary judgment. Based on Plaintiff's own sworn admissions, she failed to exhaust her administrative remedies for her Title VII race and retaliation claims; brought a claim under Maryland law when Maryland law does not apply; brought another claim for wrongful termination when she resigned and, therefore was never terminated; claims a breach of contract under her Collective Bargaining Agreement that requires her to exhaust her remedies that she did not and could not pursue because she was never terminated; and finally, claims a "reverse" national origin discrimination case, where there is not a shred of evidence that Georgetown University Hospital is an anti-American employer.

This is a case where Plaintiff's own admissions under oath demonstrate that each and every count of this Complaint is baseless. This Court, at a recent status conference, strongly suggested that Plaintiff review the allegations in the Complaint and dismiss those which discovery had shown to be without merit. Plaintiff ignored the Court's suggestion. Plaintiff's counsel also ignored Defendant Georgetown University Hospital's Rule 11 letter (Exh. 1) demonstrating that the case lacked legal and factual merit. As a result, judicial resources will be consumed by a case that, based on the Plaintiff's own sworn testimony, should never have been filed.

## II.

## <u>SUMMARY OF ARGUMENT</u>

This summary judgment motion seeks dismissal of Plaintiff's Second Amended

Complaint ("Complaint") based on Plaintiff's own testimony, which is summarized as follows:

- Count I is a Title VII claim based on Maryland law, but Plaintiff admitted under oath that all of the events in this case occurred in the District of Columbia. *See* Deposition of Bonita Brown ("Pl. Dep.") at 77:15-20 (relevant transcript excerpts attached as Exh. 2).

- Count I also makes references to race discrimination under Title VII, yet the supervisor who allegedly harbored racial animus is also Black – the same race as Plaintiff.  Moreover, Plaintiff never filed an EEOC charge of race discrimination and therefore failed to exhaust her administrative remedies.

- Count I also makes reference to retaliation under Title VII, yet Plaintiff admits that she never engaged in statutorily protected activity; rather, her supervisor "was trying to get rid of me because of her personal issues. … I believe she was having an affair with her ex-boyfriend." *See* Pl. Dep. at 114:13 – 115:2. Moreover, Plaintiff never filed an EEOC charge of retaliation and therefore failed to exhaust her administrative remedies.

- Count I also makes reference to national origin discrimination, but Plaintiff is admittedly American and her "reverse" national origin discrimination claim fails to meet the higher standards for such a "reverse discrimination" claim. Indeed, there is not a shred of evidence that her American origin motivated any discrimination.

- Count II is a claim for wrongful termination.  Regardless of the fact that the District of Columbia does not recognize such a claim, Plaintiff admitted under oath that she took FMLA leave and while on FMLA leave, started working for another employer; that she could have returned to her job at the Hospital, but chose not to; and that she submitted a written letter of resignation.  *See* Pl. Dep. at 69:1 – 71:6; 72:7 – 76:9.

- Count III is a claim for breach of contract, but Plaintiff admitted under oath that the contract is the SEIU Union Contract and Plaintiff has not and could not exhaust her termination claims through the Union grievance process because she resigned.  *See* Plaintiff's Deposition at 76:15 – 77:8; *see also* 116:17 – 117:8.

- Count VI is a claim for intentional infliction of emotional distress but Plaintiff admitted under oath that the actions that she believed constituted intentional infliction of emotional distress in the Complaint "all occurred in the context of

her employment relationship with Georgetown University Hospital." *See* Pl. Dep. at 117:9 – 118:16.  Under the applicable District of Columbia case law, Plaintiff's allegations in the Complaint are "of the type that are attributable to employer-employee conflicts [that] do not, as a matter of law, rise to the level of outrageous conduct." *Thompson v. Jasas Corp.*, 212 F. Supp. 2d, 21, 28 (D.D.C. 2002).

### III.

### STATEMENT OF MATERIAL UNDISPUTED FACTS

**A.    Plaintiff Was An At-Will Employee Of Georgetown University Hospital.**

1.    Defendant Georgetown University Hospital ("the Hospital") is one of the most respected hospitals in the nation.  The Hospital has a comprehensive Equal Employment Opportunity Policy that prohibits all forms of illegal discrimination, including discrimination based on race.  The policy provides, in pertinent part, as follows:

> Georgetown University Hospital is an equal opportunity employer and is committed to equal opportunity for all candidates for employment and employees.  Where federal, state or local laws contain mandatory requirements that differ from the provisions of this section, such legal requirements prevail for employees working in affected locations.  In furthering its commitment to provide equal opportunities, it is Georgetown University Hospital's policy to. . .

> \* \* \* \* \*

> Prohibit unlawful discrimination or harassment in any employment decision or in the administration of any personnel policy because of race, color, creed, religion, national origin, citizenship, sex, age, physical or mental disability, marital status, personal appearance, family obligations, political affiliations, sexual preference or orientation or any other characteristic protected by federal, state, or local EO laws and regulations.

Georgetown University Hospital Employment Manual, dated May 1, 2003 ("Employment Manual"), Policy No. 201 (Exh. 3).

2.    The Hospital hired Plaintiff Bonita Brown, an African-American, as a Clinical Technician on March 25, 2003 in the Interventional Radiology Short Stay Unit C-41.  Pl. Dep. at

11:20 – 12:5; Second Amended Complaint ("SAC") ¶ 5.   Plaintiff remained in this at-will position until she resigned on November 14, 2005.  Pl. Dep. at 12:6-9; 71:3-6.

      3.      The essential functions of her Clinical Technician position included implementing "patient's plan of care as directed by the RN [Registered Nurse], reporting information and findings to the RN, and offering suggestions for revision of the plan of care as appropriate." Clinical Technician Position Description (Exh. 4); Pl. Dep. at 12:14 – 13:7.

      4.      Plaintiff was a member of District 1199E-DC, Health Care Workers Union SEIU ("SEIU") for the entire course of her employment at the Hospital.  Pl. Dep. at 76:10 – 77:8.

      5.      All of the facts and circumstances involved in this lawsuit occurred at the Hospital in the District of Columbia.  Pl. Dep. at 77:17 – 78:3.

      6.      When Plaintiff was hired, her first supervisor was Christine Walsh.  Pl. Dep. at 13:8-12.   Soon thereafter, Michelle Humphrey, a Registered Nurse, became Plaintiff's supervisor. Pl. Dep. at 17:6-21.  Ms. Humphrey, who was born in England, is Black.  Pl. Dep. at 23:18; 113:2-11; Deposition of Michelle Humphrey ("Humphrey Dep.") at 4:18 – 5:5 (Exh. 5).

**B.**     **Plaintiff's Employment At The Hospital Was Plagued With Disciplinary Problems.**

      7.      Plaintiff's employment history was wrought with disciplinary problems.  Her Personnel File contains over thirty pages of disciplinary documents.  For example, only four months after Plaintiff began work she received a verbal warning for refusing an assignment and being rude to Lorraine Green, a Clinical Administrator.  7/9/03 Letter from M. Humphrey (Exh. 6).  Plaintiff refused to sign the  verbal warning.  *Id.*

      8.      On August 19, 2003, Plaintiff again refused an assignment and was sent home without pay.  9/3/03 Letter from K. Murto (Exh. 7).  Plaintiff received a written warning in response to her insubordination.  *Id.*

9.     Plaintiff received a second written warning for insubordination on February 28, 2005, after she refused her supervisor's request that she help complete the morning labs and EKGs.  2/28/05 Letter from M. Humphrey (Exh. 8).  On the day in question, the Unit was extremely busy and Plaintiff was the only qualified person to assist.  3/8/05 Letter from P. Fofung (Exh. 9); 3/8/05 Letter from R. Alcantara (Exh. 10); 3/8/05 Letter from E. Fisher (Exh. 11).  In refusing the request, Plaintiff told the requesting nurse that "I believe in teamwork, but I can't work with someone who's being smart at the mouth."  Plaintiff's Explanation of 2/23/05 incident (Exh. 12).  Instead of helping the busy nurses, Plaintiff sat and conducted personal business on the internet.  2/23/05 Report of Incident (Exh. 13); 3/8/05 Letter from P. Fofung (Exh. 9); 3/8/05 Letter from R. Alcantara (Exh. 10); 3/8/05 Letter from E. Fisher (Exh. 11).

C.     **Plaintiff's Schedule Was Changed To Meet The Needs Of The Unit's Patients.**

10.     On May 5, 2005, the Hospital issued Plaintiff a letter providing her five weeks notice that her schedule would change from 5:30 p.m. – 6:00 a.m. to 7 p.m. – 7:30 a.m.  5/9/05 Letter from M. Humphrey (Exh. 14).  This change was necessitated by the increase in patients who had to be prepped and attended to between 6:30 and 7:30 a.m.  *Id*.  Plaintiff's previous supervisor, Christine Walsh had allowed Plaintiff to begin and end her shift earlier than otherwise scheduled.  However, the Hospital determined that patient needs no longer allowed such an arrangement.  Pl. Dep. at 32:6 – 33:6; SAC ¶ 13.  Plaintiff was the only clinical technician on the affected shift.  Pl. Dep. at 33:7-9.

D.     **On May 25, 2005, Plaintiff Attended A Staff Meeting Where Communications On The Unit Were Discussed.**

11.     On May 25, 2005, Ms. Humphrey, Plaintiff's supervisor, led a Unit meeting dealing with teamwork and communication on the Unit.  Pl. Dep. at 84:11–18; Humphrey Dep. at 79:2-3 (Exh. 5); EEOC Complaint (Exh. 15).  Because the people on the Unit staff belonged to

5

many different cultures, Ms. Humphrey wanted to raise everyone's awareness and sensitivity to cultural differences.  Humphrey Dep. at 79:2–15 (Exh. 5).  As Ms. Humphrey testified under oath, "I was explaining that to some cultures, if you beckon somebody with your – this finger … that is offensive to some cultures, just like if you click your fingers, that's offensive.  And I said, you know, that's a cultural thing that we have to be mindful that we're all from different cultures, so please be mindful when you're addressing people, because it's easy to offend other cultures."  Humphrey Dep. at 79:2-15 (Exh. 5).  Ms. Humphrey further explained the inadvertent miscommunications that can arise in a cultural diverse setting by stating "it's a cultural thing." Pl. Dep. at 86:18 – 87:2.

12.    Under oath, Plaintiff admitted that the context of Ms. Humphrey's comment was the need for improvement in communications on the multiculturally staffed Unit:

> Q:    Would it be fair to say that the discussion was generally about teamwork and communication within that unit?
>
> A:    Yes.
>
> Q:    And were there concerns expressed  that there was less teamwork and communication on that unit than there were on other units?
>
> A:    Yes.
>
> Q:    And was that what Ms. Humphrey was referring to when she said, it's a cultural thing, the communication between and among people that are on the unit?
>
> A:    Yes.

Pl. Dep. at 84:11 – 85:1.

* * * * *

> Q:    And to your understanding, when Ms. Humphrey used the term, it's a cultural thing, was she referring to the concerns that had been expressed about lack of communication on the staff comprised of people from all different places?

A:    Yes.

Pl. Dep. at 86:18 – 87:2.

**E.    On May 25 And 26, 2005, Plaintiff Engaged In Gross Misconduct And Rude Behavior With Patients.**

13.    On May 25, 2005, Plaintiff was helping a nurse turn a patient, Patient G.,[1] who had recently undergone hip surgery.  Pl. Dep. at 40:7-10; 5/27/05 Letter from Daughter[2] (Exh. 16).  When Plaintiff and the nurse, James Babio, were turning Patient G., he cried out in pain. 6/2/05 Statement of J. Babio (Exh. 17); 5/27/05 Letter from Daughter (Exh. 16).  This greatly concerned one of Patient G.'s daughters who thought Plaintiff was being too rough with her father, as Plaintiff admitted, she was "pulling and slugging him around in the bed."  5/26/05 Statement of Plaintiff (Exh. 18).  Patient G.'s relatives asked Plaintiff to stop turning him and explain the procedure to him.  6/1/05 Letter from M. Humphrey (Exh. 19).

14.    Plaintiff then became argumentative with the relatives and refused to get another member of the staff to replace her as the relatives had requested.  *Id.*  Instead, Plaintiff went to get the charge nurse, who apologized to Patient G.'s family and instructed Plaintiff that she was to stay off the floor for the remainder of her shift.  5/26/05 Incident Report (Exh. 20); 6/2/05 Statement of J. Babio (Exh. 17).

15.    After Plaintiff had been removed from attending to Patient G., the patient's family overheard Plaintiff making disparaging remarks about them on the unit.  5/27/05 Letter from Daughter (Exh. 16); 5/26/05 Incident Report (Exh. 20).  These comments made the family worry

---

[1]    For purposes of patient privacy, the patient's name is not being used in this brief, and has been redacted from supporting documents.

[2]    The author of this letter was Patient G.'s daughter.  For patient privacy purposes, therefore, her name and other identifying information is not being used in this brief and has been redacted from supporting documents.

that Plaintiff was "poisoning" the rest of the staff against them and that it could lead to lesser care for their father.  5/26/05 Incident Report (Exh. 20); 5/27/05 Letter from Daughter (Exh. 16).

16.    On May 26, Plaintiff was asked to assist with Patient G.  Pl. Dep. at 89:10-17. Plaintiff refused.  According to Plaintiff, she refused to assist with the patient both because she had been working as a secretary (and secretaries are not allowed in patient's rooms), and due to the previous conflict with Patient G's family.  Pl. Dep. at 89:10-17.

17.    That same day, three other staff members complained that Plaintiff was answering phones in an unprofessional and rude manner.  5/26/05 Incident Report (Exh. 20); 5/26/05 Statement of L. Stringi (Exh. 21); 5/27/05 Statement of K. Jackson (Exh. 22).

**F.    Based On Two Separate Incidents Of Gross Misconduct, Plaintiff Was Suspended With Pay Pending Investigation.**

18.    As a result of the foregoing conduct, Plaintiff's employment was suspended with pay from May 26 through June 6, 2005.  Plaintiff's Letter of Suspension summarized part of her conduct as follows:

> On May 26, 2005, it is alleged that you were asked by a nurse to help turn a patient, however the patient was in pain.  The relatives of the patient asked that you stop turning him and explain the procedure to their father.  You then became argumentative with the relatives of the patient and refused to get another member of staff to replace you at their request.  You were then overheard by the family discussing the situation and talking about the patient's family members.

6/1/05 Letter from M. Humphrey (Exh. 19).

**G.    Plaintiff Admits That She Has No Basis To Believe That She Was Suspended Due To Her National Origin.**

19.    In an EEOC complaint, Plaintiff alleged that her suspension for refusing to help with Patient G.'s treatment on May 26, after the conflict with his family, was an act of

discrimination based on her national origin (citizen of the United States). EEOC Complaint (Exh. 15).

20. However, when asked during her deposition why she believed her suspension was because of her national origin, she testified, "I can't answer that." Pl. Dep. at 90:13-18.

**H. Plaintiff Admits That She Repeatedly Refused To Meet with Ms. Humphrey To Discuss Her Annual Performance Evaluation.**

21. After returning from her suspension, on July 27, 2005, Plaintiff refused to meet with Ms. Humphrey to receive her annual performance evaluation. Plaintiff testified under oath that she refused to meet with her supervisor because she "didn't have time." Pl. Dep. at 54:19 – 55:13.

22. On August 1, 2005, Plaintiff received a letter informing her that she was scheduled to meet with Ms. Humphrey on August 3, and requesting that she make sure that her union representative was also present. SAC ¶ 22; 8/1/05 Letter from M. Humphrey (Exh. 23). Pl. Dep. at 56:13 – 57:17. Plaintiff refused to attend the scheduled appointment. Pl. Dep. at 57:4-17.

23. On August 17, 2005, Plaintiff refused Ms. Humphrey's direct request to report to her office three times. Pl. Dep. at 59:10 – 60:5; 8/17/05 Statement of M. Humphrey (Exh. 24); 8/17/05 Statement of F. Ali (Exh. 25). Ms. Fofung, Plaintiff's co-worker, stated, "the tone of voice that Bonita [Plaintiff] used was extremely rude, belligerent and disrespectful towards her boss, Michelle [Humphrey]. After the incident, I was so flabbergasted by what had happened that I called Michelle to make sure that she was alright." 8/18/05 Memo by P. Fofung (Exh. 26). As a result of Plaintiff's further insubordination, Ms Humphrey gave Plaintiff another written warning. 11/3/05 Letter From M. Humphrey (Exh. 27).

24.     Plaintiff admits that she refused to meet with her supervisor on three separate

occasions:

> Q:      And do you recall these circumstances on August 17, 2005?
>
> A:      Yes, sir.
>
> Q:      And did you refuse twice to follow Ms. Humphrey's instructions to report to her office and meet with her?
>
> A:      I refused 3 times.
>
> Q:      3 times?
>
> A:      Yes, Sir.

Pl. Dep. at 59:17 – 60:4.

> Q:      Over what time period did you refuse these 3 requests?
>
> A:      In the same conversation as I was asking her, what is this about, and she said, I'm not going to tell you. I said, well, I'm not coming. For the last time I asked her, Michelle, what is this about, I'm in the middle of doing patient care. She said, I'm not going to tell you. She said, you are being insubordinate. I said, well, yes, if you want to put it that way.  She said, okay. She hung the phone up.

Pl. Dep. at 60:19 – 61:12.

25.     Based on Plaintiff's admitted insubordination, as well as her repeated refusals to

meet with her supervisor to conduct Plaintiff's annual performance evaluation, Ms. Humphrey

called security and had Plaintiff escorted off hospital premises.  Pl. Dep. at 60:16; 8/18/05 Memo

by P. Fofung (Exh. 26); 8/17/05 Statement of M. Humphrey (Exh. 24).  The Hospital removed

Plaintiff from the schedule until she would agree to meet with Ms. Humphrey to discuss her

annual evaluation.  8/19/05 Letter from M. Humphrey (Exh. 28).

26.     Plaintiff also received a written warning for gross misconduct for failing to meet

with her supervisor.  11/3/05 Letter from M. Humphrey (Exh. 27).

**I.    Plaintiff Takes FMLA Leave After Refusing To Meet With Her Supervisor.**

27.    Plaintiff was ill and missed work from August 18 through August 22, 2005.  After refusing to meet with her supervisor, Plaintiff applied for and was granted FMLA leave from August 22 through October 31, 2005.  FMLA Application (Exh. 29); SAC ¶¶ 25-27.  Plaintiff was originally expected to return to work on October 31.  FMLA Application (Exh. 29). Plaintiff, however, claimed that she was injured again during the period of her leave and was unable to return to work due to a new medical problem.  11/4/05 Letter from S. Gaither (Exh. 30).

28.    Plaintiff's removal from the schedule, therefore, had no impact on Plaintiff because it coincided with Plaintiff's two month FMLA leave.

**J.    While Out On FMLA Leave, Plaintiff Worked Full-Time At Another Healthcare Facility.**

29.    While out on FMLA leave, on October 10, 2005 Plaintiff admits that she began employment in a new full-time position at Charlotte Hall Veterans' Home Assisted Living.  Pl. Dep. at 72:7-20.  In contrast to her three-day a week schedule at the Hospital, Plaintiff worked a longer schedule – Monday through Friday for 7.5 hours each day at her new position.  Pl. Dep. at 73:14 – 74:8.

30.    While on FMLA leave from the Hospital, Plaintiff injured her leg when she fell in her kitchen.  Pl. Dep. at 72:1-6.  Based on this new injury, Plaintiff notified the Hospital that she would request additional FMLA time.  11/4/05 Letter from S. Gaither (Exh. 30).  The Hospital granted Plaintiff's leave request.  However, Plaintiff missed only two days of work at Charlotte Hall as a result of her new injury.  Pl. Dep. at 75:2-5.

**K.    Plaintiff Resigned In Writing Her Position At the Hospital In Lieu Of Returning From Her FMLA Leave.**

31.    Plaintiff submitted a letter of resignation on November 14, 2005, the day that she believed she was due to return from FMLA leave.  Pl. Dep. at 71:3-6; Pl.'s Resignation Letter (Exh. 31).  Plaintiff's resignation letter stated:  "I Bonita Brown am submitting this letter to the above mentioned, effective today November 14, 2005, under the circumstances, I am resigning from MedStar Health Interventional Radiology/Short Stay Unit C-41 as a Clin Tech."  Pl.'s Resignation Letter (Exh. 31).

32.    Plaintiff testified that she could have returned to her position at the Hospital after taking FMLA leave, but that she voluntarily chose to resign from her Hospital position and continue working at the nursing home.

> Q:    Now, you started work at the veterans home on October 10, 2005.  At that time, you could have returned to work at Georgetown University Hospital.  Correct?
>
> A:    Yes.
>
> Q:    But you chose not to.  Correct?
>
> A:    Yes.

Pl. Dep. at 76:1–9.

33.    When presented with her resignation letter while being deposed under oath, Plaintiff identified the letter as her resignation letter effective November 14, 2005:

> A:    My resignation letter to Sonja Gaithers.
>
> Q:    And that's your signature on the second page…?
>
> A.    Yes, Sir.
>
> Q:    And you resigned your employment effective November 14, 2005, by this letter?
>
> A.    Yes.

12

Pl. Dep. at 95:21 – 96:6.  And further:

> Q:    Okay.  But you submitted a letter of resignation, didn't you?
>
> A:    Yes.

Pl. Dep. at 114:8-10.

**L.    Plaintiff Filed An EEOC Compliant That Only Alleged "Reverse" National Origin Discrimination.**

34.    Plaintiff filed a discrimination complaint with the EEOC.  EEOC Complaint (Exh. 15).  On the standard EEOC form, a complainant is required, three times, to identify the ground(s) they are being discriminated based upon.  In all three places, Plaintiff checked a box indicating that she believed she had been discriminated against only because of her national origin.  *See id.*  No other boxes were checked.  Both race and retaliation boxes were available, but Plaintiff did not mark them.

35.    In her administrative charge, Plaintiff identified Ms. Humphrey as "British" and claimed she discriminated against Plaintiff because Plaintiff is "American."  The three instances of discrimination Plaintiff alleges are as follows:  refusing to accommodate her schedule requests; saying that "it's a culture thing" at a staff meeting; and her suspension for refusing to help with Patient G. following the altercation with his family.  *See* EEOC Complaint (Exh. 15).

**M.    On August 10, 2006, Plaintiff Filed A Claim In Federal Court, Raising For The First Time, Claims Of Discrimination Based On Race And Retaliation.**

36.    In contrast to her EEOC Charge, Plaintiff's Complaint sets forth four Counts, alleging:  discrimination based on race and national origin, as well as retaliation under Title VII and Article 49(3) of the Annotated Code of Maryland (Count I), wrongful termination (Count II); breach of contract (Count III); and intentional infliction of emotional distress (Count IV).

**N.**    **Plaintiff Admits That Her Retaliation Claim Is Based On Personal Issues With Her Supervisor And Not Statutorily Protected Activity.**

37.    During her deposition, Plaintiff testified that her retaliation claim was based on personal issues "between her and Ms. Humphrey."  Pl. Dep. at 114:13-15.  When asked to identify the protected activity that she engaged in for which she was retaliated against, Plaintiff testified that Ms. Humphrey was trying to "get rid of" her because Ms. Humphrey, who is married, was having an affair with her own ex-boyfriend and Plaintiff was aware of that fact.  Pl. Dep. at 114:15 – 116:7.    Plaintiff's so-called "protected activity" was not any report of discrimination, but rather a "soap opera-like" circumstance involving her supervisor's ex-boyfriend:

> A:    She had a break-in into her home right after her husband had went [sic] overseas and she needed a lock put on her door, and her ex-boyfriend apparently is in that line of work, and she called me to let me know that she had used my name, because his wife was "Bonita" also.  She told her husband that my husband was the one that put the lock on the door, because she could not let him know that it was her ex-boyfriend.

> Q:    And that's why you believe that Ms. Humphrey was trying to get rid of you?

> A.    Yes, sir.  And I asked her, what am I going to do when he come home, how am I going to explain this to him that I'm not married.  She said, we'll cross that bridge when we get to it, a woman has got to do what a woman has got to do.

> Q.    Now, based on what you described, it sounds like the real reason that Ms. Humphrey was trying – was taking these actions that you're complaining about is because of this affair with her ex-boyfriend.

> A:    Yes, Sir.

> * * * * *

> Q:    Is the protected activity you're referring to in the complaint the affair circumstances with the ex-boyfriend?

A:    Yes, Sir.

Pl. Dep. at 115:3 – 116:6; 116:13-16.

**O.    Plaintiff Admits That Her Breach Of Contract Claim Is Based On Her Union's Collective Bargaining Contract.**

38.    As for her Breach of Contract claim, Plaintiff testified that her breach claim pertained to her SEIU Union Contract:

Q:    ...well, I'll just read it: On or about March 2003, plaintiff was hired as an employee with defendant Georgetown University Hospital and entered into an agreement of employment. Do you see the reference?

A:    Yes, sir.

Q:    All right.  Now, we took a look at the union contract, the SEIU contract. Is that the employment contract to which you're referring?

A:    Yes.

Pl. Dep. at 116:18 – 117:8.

**P.    Plaintiff Admits That Her Emotional Distress Claim Is Based On Events That Occurred In The Context Of Her Employment.**

39.    As for her intentional infliction of emotional distress claim, Plaintiff admitted under oath that the actions that she believed constituted intentional infliction of emotional distress in the Complaint "all occurred in the context of her employment relationship with Georgetown University Hospital."  Pl. Dep. at 117:9 – 118:16.

## IV.

## STANDARD OF REVIEW

The Supreme Court has recognized that summary judgment is not a "procedural short-cut," but rather a means "to secure the just, speedy and inexpensive determination of [an] action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  There is no necessity for trial

"unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 39 (D.C. Cir. 1987), *cert. denied*, *Celotex Corp. v. Catrett*, 484 U.S. 1066 (1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Accordingly, a defendant who demonstrates that no genuine issues of material fact exist is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Catrett*, 826 F.2d at 39.

## V.

## ARGUMENT

### A.    Summary Judgment Must Be Granted As To Plaintiff's Claim Under Article 49(B) Of The Annotated Code Of Maryland Because Maryland Law Does Not Apply.

Plaintiff's claim for discrimination under Article 49(B) of the Annotated Code of Maryland should be summarily dismissed because Maryland law is entirely inapplicable and irrelevant to this case.  The Hospital is located in the District of Columbia.  Pl. Dep. at 77:9–14.  Plaintiff's employment was in the District of Columbia.  Pl. Dep. at 77:9–14.  Further, Plaintiff admitted under oath that all of the acts of discrimination that Plaintiff alleges occurred at the Hospital in the District of Columbia.  Pl. Dep. at 77:17 – 78:3.  Under District of Columbia choice of law rules, the state with the most significant relationship to the matters at issue controls.  *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018, 1026 (D.D.C. 1994).  Further, the state where the conduct occurred is likely to be the state with the most significant relationship to the matter.  *Hitchcock v. United States*, 665 F.2d 354, 361 (D.C. Cir. 1981) *citing* Restatement (Second) of Conflict of Laws § 146, Cmnt. e (1971).  In this case, there is no question that the District of Columbia has the most significant relationship to the matter.  Indeed, Plaintiff has not provided any explanation of why her claims could conceivably be brought under

Maryland law.  Because all alleged acts underlying the claim occurred within the District of

Columbia, Maryland law does not apply.

B.     **Because Plaintiff Failed To Exhaust Her Administrative Remedies, This Court Does Not Have Jurisdiction To Hear Her Racial Discrimination And Retaliation Claims.**

Before raising a Title VII racial discrimination or retaliation claim in federal court, a

plaintiff must first file an administrative charge with the EEOC.  *Bowden v. United States*, 106

F.3d 433, 437 (D.C. Cir. 1997); *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).  This

requirement is a jurisdictional prerequisite to filing an action in federal court.  *Sisay v.*

*Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 64 (D.D.C. 1998).  Based on well-settled case law,

this Court's jurisdiction is limited to the claims explicitly made in her EEOC complaint or claims

that are reasonably related to those made in the complaint.  *Park*, 71 F.3d at 907 (internal

quotations omitted); *Robinson-Reeder v. Am. Council on Educ.*, 2008 U.S. Dist. LEXIS 5979

*10 (D.D.C. 2008); *Caldwell v. Servicemaster Corp.*, 966 F. Supp. 33, 49 (D.D.C. 1997) ("A

claim not included in an administrative complaint is barred under Title VII unless it is like or

reasonably related to another claim or other claims that were exhausted administratively").

Here, Plaintiff only raised a claim of national origin discrimination in her EEOC

complaint.  As a result, this Court does not have jurisdiction over her subsequently added claims

of racial discrimination and retaliation.  Therefore, summary judgment as to those claims must be

granted.

In her charge, Plaintiff alleged *only* that she was discriminated against based on her

national origin.  *See* EEOC Complaint (Exh.15).  In fact, Plaintiff admitted during her deposition

that her EEOC charge only challenges the Hospital's actions based on national origin grounds.

Pl. Dep. at 79:15 – 80:9.  Despite being presented three times with a line of boxes delineating

both race and retaliation as potential grounds for discrimination, Plaintiff failed to make such

administrative charges by marking those boxes.  This failure is fatal to Plaintiff's claims of race discrimination and retaliation in this action.

This Court has routinely dismissed claims like Plaintiff's where a plaintiff has exhausted her administrative remedy as to one type of claim, but later attempted to litigate different claims. For example, in *Sisay v. Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 64 (D.D.C. 1998), this Court dismissed plaintiff's claim of national origin discrimination because the plaintiff had only exhausted administrative remedies for her claim of racial discrimination.  In so doing, this Court held that "the law recognizes that allegations of national origin discrimination are not so closely related to allegations of racial discrimination such that a conclusion about one could reasonably be expected to grow out of an investigation of the other. Indeed, Title VII recognizes that race and national origin are ideologically distinct." *Id.*  The *Sisay* court further reasoned that "under Title VII, allegations of race discrimination may be wholly unrelated to a claimant's country of origin.  Such allegations, therefore, do not properly put defendants on notice to investigate possible discrimination based on national origin." *Id.* (dismissing national origin claims for failure to exhaust administrative remedies where plaintiff had only alleged racial discrimination in his EEOC charge).  The same is true here.

Similarly, Plaintiff's new claim of retaliation was not alleged in her EEOC Charge and it does not reasonably relate to any of the allegations set forth in the Charge.  Where "a fair characterization of plaintiff's EEOC charge does not include a charge of retaliation" plaintiff's claim is not exhausted and courts do not have jurisdiction.  *Robinson-Reeder*, 2008 U.S. Dist. LEXIS 5979 at *13 (dismissing a retaliation claim for failure to exhaust administrative remedies).  As Plaintiff made clear in her deposition, her retaliation claim is based on her belief that she was retaliated against because she believed Ms. Humphrey was having an affair with

Ms. Humphrey's ex-boyfriend. Pl. Dep. at 115:3 – 116:6; 116:13-16.  There is nothing that even remotely relates to this claim or allegation in Plaintiff's EEOC Charge.  As such, Plaintiff failed to exhaust her administrative remedies for her retaliation claim and, therefore, the claim should be dismissed.

Plaintiff failed to exhaust her administrative remedies for her claims of racial discrimination and retaliation.  Because exhaustion of administrative remedies is a jurisdictional prerequisite, summary judgment should be granted as a matter of law.

**C.     Plaintiff's Reverse National Origin Discrimination Claim Must Fail, As A Matter of Law.**

There is not a shred of evidence in this case that even hints that Plaintiff was discriminated against because of her American national origin.  First, Plaintiff has failed to establish that her American national origin affords her Title VII protection.  In addition, Plaintiff has failed to identify any adverse action that could support an inference of discrimination for any reason, much less, because of her American national origin.  As such, Plaintiff has failed to demonstrate a *prima facie* claim of national origin discrimination and her claim, therefore, should be dismissed.

Even if Plaintiff could establish a *prima facie* case of national origin discrimination, which she cannot, the Hospital has demonstrated legitimate, non-discriminatory reasons for all of its actions and there is not a shred of evidence suggesting that any of these reasons are pretextual.  Plaintiff, therefore, cannot satisfy her ultimate burden of proving that she was discriminated against because of her American national origin.  Accordingly, the Hospital is entitled to summary judgment on Plaintiff's reverse national origin discrimination claim, as a matter of law.

1.     **Plaintiff Has Failed to Demonstrate a *Prima Facie* Case of National Origin Discrimination.**

In order to establish a *prima facie* case of discrimination, Plaintiff in a standard discrimination action must demonstrate:  (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination.  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003).

In this case, Plaintiff cannot satisfy any of the elements of her national origin *prima facie* case.  First, as an American and, therefore, a member of the majority, Plaintiff is not a member of a protected class.  Plaintiff cannot demonstrate the "additional background facts" she must show to apply Title VII's protections to a member of a majority class.  Second, Plaintiff did not suffer any adverse employment action.  Third, even if she had suffered an adverse employment action, there is no evidence of circumstances that raise an inference of discrimination of any kind.

a.     **Plaintiff Cannot Satisfy the Higher Burden of Proving Reverse Discrimination.**

Plaintiff alleges that she was discriminated against due to her national origin – which is American.  Because Americans are the majority in this country, Plaintiff's discrimination claim is a "reverse" discrimination claim, which requires a more demanding *prima facie* showing because it is only the "unusual employer who discriminates against the majority."  *Mastro v. PEPCO*, 447 F.3d 843, 851 (D.C. Cir. 2006) (internal citations omitted).  Majority plaintiffs, like Plaintiff in this case, therefore, must plead and prove additional "background circumstances" in lieu of their membership in a protected class to satisfy the first element of the *prima facie* case. *Id*. (internal citations omitted).  Specifically, Plaintiff must demonstrate that the Hospital "has

some reason or inclination to discriminate invidiously against" members of the majority, or, in other words, that "there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *See id*. (*citing Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)); *see also Hairsine v. James*, 517 F. Supp. 2d 301, 306 (D.D.C. 2007).

Here, Plaintiff has proffered no evidence that the Hospital had any reason to discriminate against Americans in favor of people of other nationalities. Not only has she provided no evidence, she has not even hinted at any reason why the Hospital would do so. Notably, there is not a shred of evidence of specific pressures to treat non-Americans more favorably, which is the type of evidence typically used to satisfy this element. *See Mastro*, 447 F.3d at 851. In short, there is nothing to suggest that the Hospital is that highly unusual U.S. employer that discriminates against Americans.

In an apparent effort to bring her American nationality into issue, Plaintiff references Ms. Humphrey's meeting to discuss cultural sensitivities. There is no evidence, however, that this meeting in any way evidenced even a hint of anti-American bias sufficient to support an inference that the Hospital was the rare employer that discriminated against Americans. Indeed, it is undisputed that the purpose of the meeting was to raise awareness of cultural sensitivities with people of many different cultures while discussing the "culture" of communication of staff and nurses on the unit. And yet, Plaintiff was somehow offended by this remark. Pl. Dep. at 82:17-18. Specifically, Plaintiff stated that "being an African-American, I just felt they were just picking at me." Pl. Dep. at 91:20-21. Plaintiff's ephemeral belief that people were "picking at" her or that the reference to "culture" in a multi-cultural meeting was a reference to American culture, however, provides no evidence whatsoever of any background circumstances that would suggest anti-American discrimination.

**b.**    **Plaintiff has failed to demonstrate that she suffered any adverse employment actions.**

In addition to not coming forward with any evidence to suggest her American national origin is a protected class under Title VII, Plaintiff has also failed to demonstrate that she suffered any adverse employment actions that gives rise to an inference of discrimination. Although Plaintiff is not overly precise in enumerating what she feels were adverse actions taken against her, a liberal reading of the Complaint appears to reveal four such allegations: (1) she was terminated; (2) her request for a change in her schedule was denied; (3) she was suspended with pay for the incident involving Patient G.; and (4) she was removed from the schedule for rudely and repeatedly refusing to meet with her supervisor, Ms. Humphrey, to receive her annual evaluation. Based on the undisputed evidence in the record, none of these acts can be considered adverse acts for purposes of Plaintiff's American national origin discrimination claim. More importantly, there is not a shred of evidence that raises an inference that any of these acts occurred because of Plaintiff's American national origin.

This Circuit has explicitly rejected the notion that any personnel decision with negative consequences for the employee satisfies the adverse action element of the *prima facie* case. *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002). To qualify as an adverse action, the action must have had "materially adverse consequences affecting the terms, conditions, or privileges of employment or her future employment opportunities." *Brown*, 199 F.3d at 457. This requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse. *Forkkio*, 306 F.3d at

1130-31; *Brown*, 199 F.3d at 457 (stating that "[m]ere idiosyncrasies of personal preference are not sufficient to state an injury"); *Childers v. Slater*, 44 F. Supp. 2d 8, 19 (D.D.C. 1999) ("Conduct that sporadically wounds or offends but does not hinder an employee's performance does not rise to the level of adverse action").  None of the acts Plaintiff alleges resulted in a "material adverse consequence affecting the terms, conditions, or privileges" of Plaintiff's employment and even if they did, there is no evidence whatsoever that raises an inference of anti-American discrimination.

As an initial matter, it is undisputed that the Hospital never terminated Plaintiff's employment.  Instead, Plaintiff resigned in writing from the Hospital after she began working at another health care facility while on FMLA leave from her position at the Hospital.  Pl. Dep. at 71:3-6; 72:7 – 74:8 Pl.'s Resignation Letter (Exh. 31).  As Plaintiff testified at her deposition:

> Q:    Now, you started work at the veterans home on October 10, 2005. At that time, you could have returned to work at Georgetown University Hospital. Correct?
>
> A:    Yes.
>
> Q:    But you chose not to. Correct?
>
> A:    Yes.

Pl. Dep. at 76:1-9.  Instead of returning to work after FMLA leave, Plaintiff submitted a letter of resignation.  Because the cessation of her employment with the Hospital was indisputably a matter of her own choice, it could not possibly be an adverse action by the Hospital.

Second, Plaintiff's schedule change also was not an adverse action because she did not suffer "a tangible change in the duties or work conditions constituting a material employment disadvantage."  *Walker v. WMATA*, 103 F. Supp. 2d 24, 29 (D.D.C. 2000) (citation and quotations omitted); *Burlington Indus., Inc.*, 524 U.S. at 761.  Plaintiff experienced no change in employment status when her schedule changed.  Instead, Plaintiff was merely required to report

to work one and a half hours later and stay one and a half hours longer.  The length of her shift

never changed, nor did her compensation.  The fact that Plaintiff may not have agreed with the

change is not enough for the change to be considered an adverse action, as a matter of law.

*Brodetski v. Duffey*, 141 F. Supp. 2d 35, 44 (D.D.C. 2001) (ruling that "mere inconvenience" of a

two hour change in the plaintiff's shift "is not sufficiently adverse to sustain a *prima facie* case").

Third, Plaintiff's suspension with pay pending investigation of the incident with Patient

G. did not involve a significant change in her employment status or benefits and therefore was

not an adverse action, as a matter of law.  *Robertson v. Snow*, 404 F. Supp. 2d 79, 93 (D.D.C.

2005) (ruling that plaintiff's suspension with pay did not constitute an adverse action *citing*

*Peltier v. USA*, 388 F.3d 984, 988 (6th Cir. 2004) (holding that plaintiff did not suffer an adverse

personnel action when she was suspended with pay pending a timely investigation into suspected

wrongdoings)).    Plaintiff  was  suspended  pending  an  investigation  of  allegations  of

inappropriateness while dealing with a patient's family.  In response to this incident, Plaintiff

was suspended *with pay* during the investigation of the family's complaint.  Pl. Dep. at 48:15 –

50:8.

Moreover, Plaintiff admits that she has no basis to believe that she was suspended due to

her national origin.  When asked during her deposition why she believed her suspension was

because of her national origin, she testified, "I can't answer that."  Pl. Dep. at 90:13-18.  Other

than that suspension with pay, Plaintiff has not alleged any harm that she endured from the

incident; her job responsibilities did not change and she was not demoted.  Her suspension may

have been embarrassing or unpleasant, but as noted above, "[c]onduct that sporadically wounds

or offends but does not hinder an employee's performance does not rise to the level of adverse

action."  *Childers*, 44 F. Supp. 2d at 19.

Finally, Plaintiff was on FMLA leave for the entire time she was removed from the schedule for refusing to meet to discuss her annual evaluation. Therefore, Plaintiff's removal from the schedule never affected the terms or conditions of Plaintiff's employment because she could not have worked any hours she might have been assigned. Plaintiff was removed from the schedule on August 19, 2005. *See* 8/19/05 Letter from M. Humphrey (Exh. 28). Plaintiff was ill and unable to work from August 18 through 22. SAC ¶¶ 25 – 27. Starting August 22, Plaintiff was on FMLA leave. Pl. Dep. at 69:8 – 70:14. Instead of returning from her FMLA leave, Plaintiff resigned. *See* Pl.'s Resignation Letter (Exh. 31). As Plaintiff did not intend to work at the Hospital during the period that she was on FMLA leave, her removal from the schedule had no impact on her employment status. Like her other alleged adverse actions, Plaintiff's removal from the schedule was not an adverse employment action, as a matter of law.

### c.    None of the circumstances surrounding the "adverse actions" give rise to an inference of discrimination.

Even if the acts Plaintiff alleged could be considered adverse actions, which they cannot, Plaintiff has failed to demonstrate any circumstances surrounding these acts that give rise to an inference of anti-American discrimination. To establish an inference of discrimination, Plaintiff may demonstrate that she was treated differently than similarly-situated employees who were not of her national origin. *George v. Leavitt*, 407 F.3d 359, 366 (D.C. Cir. 2005) (holding that different treatment of similarly-situated employees is one method of satisfying the third prong of the disparate treatment *prima facie* case).

Plaintiff has not identified a single similarly-situated employee, regardless of their national origin, who was treated more favorably. To be considered a similarly-situated employee, Plaintiff is required "to demonstrate that all of the relevant aspects of her employment situation were nearly identical" to that employee. *Neuren v. Adduci, Mastriani, Meeks & Schill*,

43 F.3d 1507, 1514 (D.C. Cir. 1995) (internal quotations omitted); *Willingham v. Gonzales*, 391 F. Supp. 2d 52, 59 (D.D.C. 2005).  Further, regarding discipline, Plaintiff must demonstrate that another employee "charged with offenses of comparable seriousness did not suffer a similar adverse action."  *Willingham*, 391 F. Supp. 29 at 59.  "Unless the plaintiff can point to evidence in the record of another employee whose conduct and conditions of employment was sufficiently similarly situated in all material respects . . . to support at least a minimal inference that the difference of treatment may be attributable to discrimination, a disparate treatment under Title VII cannot succeed."  *Id*. (internal quotations omitted).

Plaintiff seems to allege that she was treated differently from nurses who behaved unprofessionally while employed at the Hospital.  SAC ¶¶ 15 – 16.  These allegations are irrelevant to Plaintiff's case because the two allegedly misbehaving nurses are not similarly-situated to Plaintiff.  First, Plaintiff was not a nurse, nor was she similarly-situated to any nurses.  Nurses and clinical technicians have very different jobs – they perform different tasks, have different levels of education, and have different responsibilities.  In fact, nurses have broad supervisory authority over clinical technicians, and cannot, therefore, be considered similarly-situated, as a matter of law.  *See* Clinical Technician Position Description (Exh. 4).  Moreover, there is no evidence that these nurses were not American.  Indeed, in her deposition, Plaintiff could not identify their national origins, thus conclusively demonstrating that her national origin discrimination claim is without merit.  Pl. Dep. at 126:3-16.

**2.    Had Plaintiff Established A *Prima Facie* Case, The Hospital Has Asserted A Legitimate Non-Discriminatory Reason For Its Discipline Of Plaintiff That Was Not Pretextual.**

Regardless of the fact that Plaintiff cannot satisfy her *prima facie* case, it is undisputed that all of the Hospital's actions were taken for legitimate, non-discriminatory reasons that were not pretextual.  Under the familiar *McDonnell Douglas* burden shifting test, if the plaintiff

established a *prima facie* case, "the burden shifts to the defendant to produce evidence that the plaintiff was rejected for a legitimate non-discriminatory reason." *Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006). The burden is merely one of production; the defendant must produce enough evidence for the trier of fact to conclude that the termination was because of the asserted non-discriminatory reasons. *Mastro v. PEPCO*, 447 F.3d 843, 854 (D.C. Cir. 2006).

Once a defendant offers a legitimate non-discriminatory reason for their actions, "the presumption of discrimination simply drops out of the picture." *Holcomb*, 433 F.3d at 896 (internal citations omitted); *Mastro*, 447 F.3d at 854. Courts refuse "to serve as a super-personnel department that reexamines an entity's business decisions." *Holcomb*, 433 F.3d at 897 (internal citations omitted). Therefore, "to survive summary judgment, the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for the discriminatory reason." *Mastro*, 447 F.3d at 855 (internal quotations omitted); *Walker v. Dalton*, 94 F. Supp. 2d 8, 15 (D.D.C. 2000). Here, Plaintiff fails to satisfy this standard.

### a.    The Hospital has asserted a legitimate non-discriminatory reason for its change of Plaintiff's schedule.

It is undisputed that Plaintiff's original schedule had been the result of an agreement with her previous supervisor, Christine Walsh, who let Plaintiff begin and end her shift earlier than otherwise scheduled. Pl. Dep. at 32:6 – 33:6. In a manifestation of the expression "no good deed goes unpunished," Plaintiff is now suing the Hospital for ending Plaintiff's special schedule when it threatened to impede on patient care.

The Hospital needed to change Plaintiff's schedule for a legitimate non-discriminatory business reason – in order to prepare patients for surgery. As explained in the letter sent to Plaintiff:

> [t]he reason for [the changes in schedule] are as follows; C41 has
> been saving more beds for our procedure patients who typically
> start arriving between 6.30–7.30am.  These patients need to be
> prepped for their procedures, which have typically been left to the
> nurses up until now as you have been leaving at 6:00.  As the
> number of admissions has been increasing, the nurses need more
> help with these tasks, as well as answering the call lights at this
> time; therefore, this is a unit need.

5/9/05 Letter from M. Humphrey (Exh. 14).  Nothing could be more legitimate than for a

hospital to make a shift change to better provide for the welfare of their patients.

Plaintiff suggests that the Hospital's willingness to change others' schedules

demonstrates that they were discriminating against her.  Actually, those changes demonstrate the

validity of the explanation provided to Plaintiff for her schedule change.  As detailed in the letter

explaining Plaintiff's change in schedule, the change was necessitated by the need to provide

more coverage from 6:30 through 7:30 a.m.  Two of the clinical technicians whose requests for

schedule changes were granted  had new schedules that included the 6:30 through 7:30 period.

Pl. Dep. at 35:17 – 37:8.  In other words, the accommodations granted to these two clinical

technicians served the same purpose as denying Plaintiff's request for a change in schedule:

morning preparation of patients for surgery.

> **b.    The Hospital had a legitimate non-discriminatory reason to
> suspend Plaintiff pending the investigation of Plaintiff's
> treatment of Patient G. and his family.**

In a 24-hour period from May 25-26, 2005, two complaints were lodged against Plaintiff

– one by a patient's family, and one by the charge nurse – relating to the incident with Patient G.

Pl. Dep. at 95:7-10.  The accounts received by the Hospital indicated that Plaintiff was, at best,

rude and insensitive to Patient G.'s daughter when she expressed concerns about Plaintiff's

treatment of her father.  6/2/05 Statement of J. Babio (Exh. 17); 5/27/05 Letter from Daughter

(Exh. 16).  At worst, Plaintiff may have been guilty of patient abuse as she was "pulling and slugging him around in the bed."  5/26/05 Statement of Plaintiff (Exh. 18).

Following that incident, the family then heard Plaintiff speaking badly of them to the other staff.  Patient G's daughter detailed her concerns in a letter to the Hospital:

> Bonita continued talking about it with all of the other staff, even into the next day.  Unfortunately, I heard her on four different occasions make comments like 'Oh, I can't go in there, I'm not allowed,' and 'you know these people come in here and are so rude."  We believe such behavior to be extremely unprofessional and quite juvenile, but worse such behavior caused us to question the impact her continued innuendos to other staff would have on the care provided to our father.  In these already stressful situations, fear of inferior care should not have been an issue.

5/27/05 Letter from Daughter (Exh. 16).

Additionally, on May 26, Plaintiff, while working as a secretary, answered the phones so rudely that even more complaints were registered against her.  5/26/05 Incident Report (Exh. 20); 5/26/05 Statement of L. Stringi (Exh. 21); 5/27/05 Statement of K. Jackson (Exh. 22).   Her behavior was characterized as "out of control."  5/26/05 Incident Report (Exh. 20).

Plaintiff was suspended pending investigation of allegations of outrageous, rude, unprofessional, and inconsiderate behavior that affected both the comfort of a patient and his family, as well as the cohesiveness of the workplace for the staff.  The only evidence in the record is that Plaintiff was suspended for these legitimate and non-discriminatory reasons.

### c.  The Hospital had a legitimate non-discriminatory reason for removing Plaintiff from the schedule.

Plaintiff was removed from the schedule because of her multiple insubordinate refusals to meet with her supervisor to receive her annual evaluation.   On July 27, 2005, Plaintiff's supervisor, Ms. Humphrey, requested that Plaintiff meet with her to discuss Plaintiff's annual evaluation.  Pl. Dep. at 54:19-21.  Plaintiff refused.  Pl. Dep. at 54:21 – 55:8.  On August 1,

2005, Plaintiff was notified that she was expected to meet with Ms. Humphrey to receive her annual evaluation on August 3.  8/1/05 Letter from M. Humphrey (Exh. 23); 8/4/05 Letter from M. Humphrey (Exh. 32).  Again, Plaintiff refused to meet with Ms. Humphrey.  Pl. Dep. at 57:4-17.  On August 17, 2005, Ms. Humphrey again attempted to meet with Plaintiff to discuss her annual evaluation.  That day alone, Plaintiff refused Ms. Humphrey's request to meet three times, even after being warned that refusing to meet would be an act of insubordination.  Pl. Dep. at 61:3-12; 11/3/05 Letter from M. Humphrey (Exh. 27).  A witness described Plaintiff's tone of voice during her telephone conversation with Ms. Humphrey as "extremely rude, belligerent and disrespectful towards her boss, Michelle [Humphrey]."  8/18/05 Memo of P. Fofung (Exh. 26).  Based on these repeated instances of insubordination, Plaintiff was notified that she would be removed from the schedule until she met with Ms. Humphrey to discuss her evaluation.  8/19/05 Letter from M. Humphrey (Exh. 28).

The undisputed facts demonstrate that all of the Hospital's alleged adverse actions first of all were not adverse actions at all, and even if they were, they were all enacted for legitimate, non-discriminatory reasons – either the promotion of patient care or Plaintiff's own insubordination and/or gross misconduct.  There is not a shred of evidence to suggest that any of these undisputed, legitimate, non-discriminatory reasons are pretextual.  Indeed, there is not a shred of evidence to support Plaintiff's baseless claim that she was discriminated against because she is American.  Plaintiff admitted as much when she responded "I can't answer that" in response to a question about why she thought her suspension was discriminatory on account of her national origin.  Pl. Dep. at 90:13-18.

**D.     Plaintiff Has Failed To State A Claim for Race Discrimination As A Matter Of Law.**

Assuming, for the sake of argument, that Plaintiff had not failed to exhaust her administrative remedies, summary judgment on her race claim should be granted because there is not a shred of evidence that Plaintiff was discriminated against because of her race.  Notably, Plaintiff has failed to demonstrate (1) that she suffered any materially adverse employment action and (2) has failed to provide any evidence that could possibly lead to an inference that Plaintiff was discriminated against based on her race.  Additionally, the Hospital has asserted legitimate non-discriminatory reasons for all actions taken against Plaintiff, and there is no evidence whatsoever that any of these reasons were pretextual.

As detailed above in relation to Plaintiff's national origin discrimination claim, Plaintiff did not suffer an adverse action.  Plaintiff was not terminated.  *See, e.g.,* Pl.'s Resignation Letter (Exh. 31).  Refusing to alter Plaintiff's schedule in a way that would compromise patient care is not an adverse action.  *See* 5/9/05 Letter from M. Humphrey (Exh. 14).  Suspension with pay to investigate multiple complaints against Plaintiff is not an adverse action because the terms of Plaintiff's employment were not affected.  Finally, removing Plaintiff from the schedule until she met with her supervisor to receive her annual evaluation was not an adverse action because Plaintiff was already out on FMLA leave and therefore not on the schedule anyway.  *See* 6/1/05 Letter from M. Humphrey (Exh. 19); 8/19/05 Letter from M. Humphrey (Exh. 28).

Second, Plaintiff has provided no evidence that could possibly give rise to an inference of discrimination.  Plaintiff has never even attempted to demonstrate why she believes that any "adverse actions" were related to her race.  As explained above, Plaintiff has not identified any similarly situated employees who Plaintiff feels were treated more favorably than her on account of their race.

The insufficiency of Plaintiff's allegations on this issue is especially glaring because the only person who allegedly discriminated against her based on race – Ms. Humphrey – is the same race as Plaintiff. Pl. Dep. at 113:2-6. As a general rule, when the discrimination is allegedly at the hands of someone of the same protected class, discrimination is more difficult to establish. *Schmidt v. Chao*, 2006 U.S. Dist. LEXIS 38870 *14 (D.D.C. 2006) (explaining that where the decision makers are of the same race of plaintiff, it weights against an inference of discrimination); *Walker v Dalton*, 94 F. Supp. 2d 8, 16 (D.D.C. 2000) (using fact that one of the people who ranked plaintiff was of his protected class to weigh against an inference of discrimination); *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir. 1998) (noting that because plaintiff was terminated by someone older than him, plaintiff had a "tough row to hoe" to show pretext in his age discrimination claim).

Third, the Hospital has articulated legitimate non-discriminatory reasons for the disciplinary actions taken against Plaintiff, namely patient care and reports of her lack of professionalism and rudeness towards both staff and patients, that are undisputed and in no way pretextual. The Hospital refused to grant Plaintiff's request for a different schedule so that they could better serve the needs of patients who needed to be prepped for surgery. *See* 5/9/05 Letter from M. Humphrey (Exh. 14). The Hospital suspended Plaintiff with pay in response to complaints a patient's relatives regarding an incident that could have compromised the patient's health and treatment at the Hospital. *See* 6/1/05 Letter from M. Humphrey (Exh. 19). Finally, the Hospital removed Plaintiff from the schedule because of numerous and insubordinate refusals to meet with her supervisor to receive her annual evaluation. *See e.g.* Pl. Dep. at 59:10 – 60:5; 8/17/05 Statement of M. Humphrey (Exh. 24).

Plaintiff has failed, as a matter of law, to state a claim of racial discrimination. Plaintiff has not identified any similarly-situated employees of a different race who were treated more favorably, and has not even managed to articulate why she believes that her supervisor, a member of her own race, would discriminate against her on that basis.

**E.      Plaintiff Has Failed To State A Claim For Retaliation Because She Did Not Engage In A Protected Activity.**

Had Plaintiff exhausted administrative remedies, which she did not, her retaliation claim would still fail because there is no evidence that the retaliation was in response to a protected activity.

In addition to its protections against discrimination on protected grounds, Title VII "forbids an employer from discriminating against an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (internal quotations omitted). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in a statutorily protected activity; (2) that she suffered a materially adverse action from her employer; and (3) that there was a causal connection between the protected activity and the materially adverse action. *Wiley v. Glassman*, 511 F.3d 151, 155-56 (D.C. Cir. 2007); *Taylor*, 350 F.3d at 1292; *Brown*, 199 F.3d at 452.

Plaintiff's claim fails as a matter of law because the activity Plaintiff engaged in was not protected. "An activity is protected for the purposes of a retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (internal quotations omitted). Plaintiff ties her retaliation claim, not to any form of

discrimination under Title VII, but to personal issues with her supervisor unrelated to any

protected activity.  Under oath, Plaintiff explained the background facts that illuminate her

retaliation claim.  According to Plaintiff, Ms. Humphrey had been having an affair with Ms.

Humphrey's ex-boyfriend and that is why she was trying to "get rid of" Plaintiff.  Pl. Dep. at

114:17 – 115:1.  As Plaintiff testified:

> A:    She had a break-in into her home right after her husband
>       had went overseas and she needed a lock put on her door,
>       and her ex-boyfriend apparently is in that line of work, and
>       she called me to let me know that she had used my name,
>       because his wife was "Bonita" also.  She told her husband
>       that my husband was the one that put the lock on the door,
>       because she could not let him know that it was her ex-
>       boyfriend.
>
> Q:    And that's why you believe that Ms. Humphrey was trying
>       to get rid of you?
>
> A.    Yes, sir.  And I asked her, what am I going to do when he
>       come home, how am I going to explain this to him that I'm
>       not married.  She said, we'll cross that bridge when we get
>       to it, a woman has got to do what a woman has got to do.
>
> Q.    Now, based on what you described, it sounds like the real
>       reason that Ms. Humphrey was trying – was taking these
>       actions that you're complaining about is because of this
>       affair with her ex-boyfriend.
>
> A:    Yes, Sir.
>
>                    *  *  *  *  *
>
> Q:    Is the protected activity you're referring to in the complaint
>       the affair circumstances with the ex-boyfriend?
>
> A:    Yes, Sir.

Pl. Dep. at 115:3 – 116:6; 116:13-16.  Although Plaintiff's explanation of why Ms. Humphrey

would have claimed the locksmith was married to Plaintiff, or why that subsequently would have

been such a problem, is not apparent; one thing is perfectly clear:  Plaintiff's claim of retaliation

is not based on statutorily protected activity.  To the contrary, the retaliation claim is based on

personal issues with Ms. Humphrey – a wholly unprotected activity. There is no link to discrimination based on a protected class or participation in investigation of any such claim. As a result, Plaintiff's claim of retaliation must fail as a matter of law because (1) she did not exhaust her administrative remedies as detailed above and (2) the claim is not based on a statutorily protected activity.

**F.     Plaintiff's Wrongful Termination Claim Must Be Dismissed Because She Resigned.**

Plaintiff's claim for wrongful termination must be dismissed, as a matter of law for two reasons. First, the Hospital did not terminate her employment. Second, even if it did, wrongful termination is not a cognizable claim under District of Columbia law.

It is undisputed that Plaintiff was not terminated. Instead, the only evidence in the record is that Plaintiff resigned. Because she voluntarily chose to leave her employment at the Hospital, Plaintiff was not terminated at all, much less wrongfully terminated. Plaintiff admitted under oath that she was not terminated, but instead submitted a letter of resignation. Pl. Dep. at 95:17 – 96:6; 114:4-10; *see* Pl's Resignation Letter (Exh. 31). Further, Plaintiff has made no claim of constructive discharge. *See* SAC. Incredibly, while on FMLA leave, Plaintiff began new employment at Charlotte Hall Veterans' Home Assisted Living Complex. Pl. Dep. at 69:2 – 73:19. Plaintiff could have returned to work at the Hospital, but she chose not to. As Plaintiff explained under oath:

> Q:     Now, you started work at the veterans home on October 10, 2005. At that time, you could have returned to work at Georgetown University Hospital. Correct?
>
> A:     Yes.
>
> Q:     But you chose not to. Correct?
>
> A:     Yes.

Pl. Dep. at 76:1-9.  In other words, while out on FMLA leave and having recovered sufficiently to work again, Plaintiff admits that she *chose* to secure new employment instead of returning to her position at the Hospital.  Then, after further extending her FMLA leave, while missing only two days of work at her new job, Plaintiff submitted a resignation letter to the Hospital on November 14, 2008.  Pl. Dep. at 72:7 – 75:5; 95:19 – 96:6.  Amazingly, Plaintiff has brought a wrongful termination claim when all the facts of her testimony demonstrate that she resigned and was not terminated.

Even if she had been terminated, Plaintiff's claim must still fail because "the District of Columbia does not recognize wrongful discharge for an at-will employee."  *Frazier v. University of Dist. of Columbia*, 742 F. Supp. 28, 29 (D.D.C. 1990).   In the District of Columbia, all employment is presumed to be at-will.  *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 67 (D.D.C. 2005).  As a general rule, in the District of Columbia, "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all."  *Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28, 30 (D.C. 1991); *Nolting v. Nat'l Capital Group, Inc.*, 621 A.2d 1387, 1388 (D.C. 1993); *Owens v. Nat'l Med. Care, Inc.*, 337 F. Supp. 2d 131, 136 (D.D.C. 2004).  Plaintiff is an at-will employee and as such cannot maintain a claim for wrongful termination.  While the Hospital had the right to discharge Plaintiff, at any time or for any reason, it never exercised this right.  Instead, Plaintiff resigned.

**G.    Plaintiff, An At-Will Employee, Has Failed To Produce Evidence Of Any Contract Breach.**

In Count III of her Complaint, Plaintiff alleges a breach of contract claim.  This claim is without merit.  As an at-will employee, Plaintiff cannot maintain a breach of contract claim based on her alleged termination, even assuming she was terminated, which she was not. *Daisley*, 372 F. Supp. 2d at 69 (explaining that absent evidence of clear contractual intent to

rebut the presumption of at-will employment, an at-will employee has "no remedy in contract law for [her] termination").

In apparent recognition of this black letter law, Plaintiff explained, under oath, that the agreement she claims the Hospital breached is the Collective Bargaining Agreement (CBA) between the Hospital and the District 1199 D.C. Health Care Workers Union SEIU.  Pl. Dep. at 76:15 – 77:8; 116:17 – 117:8, *see* CBA (Exh. 33).  As the Supreme Court has explained, however, suits "alleging the violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985).  Therefore, Plaintiff's claim for breach of the Collective Bargaining Agreement must be evaluated under Section 301.

Section 301 requires that any action for breach of a labor contract must first proceed through the grievance procedures established by that agreement.  *Vaca v. Sipes*, 386 U.S. 171, 184 (1967) (holding that "it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement").  Plaintiff did not attempt to use the grievance procedures established by her CBA, and she could not, because she voluntarily resigned and was not terminated.  Because she did not exhaust her remedies through the grievance procedures established in the CBA, this Court has no jurisdiction over Plaintiff's claim, and summary judgment must be granted.

**H.    The Facts Plaintiff Alleges Are Insufficiently Outrageous, As A Matter Of Law, To State A Claim For Intentional Infliction Of Emotional Distress.**

Plaintiff's intentional infliction of emotional distress ("IIED") claim must be dismissed because it is based on actions attributable to employer-employee conflicts that do not, as a matter of District of Columbia law, rise to the level of outrageous conduct.  In order to recover on an IIED claim, Plaintiff must demonstrate that she experienced "extreme and outrageous conduct

37

which intentionally or recklessly cause[d] severe emotional distress." *Thompson v. Jasas Corp.*, 212 F. Supp. 2d 21, 28 (D.D.C. 2002). In addition, "liability will be imposed only for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 27-28.

In the employment context, however, the proof required in the District of Columbia to support an IIED claim "is particularly demanding." *Id.* at 28; *see Wade v. WMATA*, 2005 U.S. Dist. LEXIS 12972 *17 (D.D.C. 2005) (distinguishing between successful claims that involved personal, sexual and physical elements versus the purely occupational threats that were common in unsuccessful IIED claims). This demanding standard is necessary to prevent the expansion of the tort to "thousands upon thousands" of employment disputes. *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997). Accordingly, it is well settled in this jurisdiction that allegations "of the type attributable to 'employer-employee conflicts . . . do not, as a matter of law, rise to the level of outrageous conduct." *Thompson*, 212 F. Supp. 2d at 28 (adopting and quoting *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997)). Here, all of Plaintiff's allegations are of the type attributable to employer-employee conflicts that do not, as a matter of law, rise to the level of outrageous conduct. *Id.*; Pl. Dep. at 118:6-17.

Specifically, Plaintiff's IIED claim rests largely on the allegation that "[o]n August 17, 2006 Plaintiff was forcibly escorted off of Georgetown University Hospital premises, without explanation or paperwork." SAC ¶ 47; *see* Pl. Dep. at 117:9-21. It is undisputed that Plaintiff was escorted from the Hospital because of her repeated, insubordinate refusals to meet with her supervisor to discuss her annual evaluation. Plaintiff admitted under oath that the actions that she believed constituted IIED in the Complaint "all occurred in the context of her employment

relationship with Georgetown University Hospital."  Pl. Dep. at 117:9 – 118:16.  This is a classic example of an employer-employee dispute that cannot, as a matter of law, rise to the level of outrageous conduct necessary to support an IIED claim.  *Thompson*, 212 F. Supp. 2d at 28.

## CONCLUSION

Based on Plaintiff's own admissions, this case is wholly lacking in factual or legal merit. The Complaint should be dismissed in its entirety and this Court should consider sanctions as appropriate.

Dated:  March 12, 2008                    Respectfully submitted,


                                          ___*/s/ Keith J. Harrison*_____
                                          Keith J. Harrison, Esq. (D.C. Bar No. 416755)
                                          Daniel M. Creekman, Esq. (D.C. Bar No. 488983)
                                          Crowell & Moring LLP
                                          1001 Pennsylvania Avenue, N.W.
                                          Washington, D.C.  20004-2595
                                          (202) 624-2500
                                          (202) 628-5116 (facsimile)

                                          Counsel for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of March, 2008, a copy of the foregoing document, "Defendant Georgetown University Hospital's Motion for Summary Judgment" was served by electronic mail service, upon the following individual:

Reuben B. Collins, II (Bar No. 14561)
Collins & Talley LLC
201 Centennial Street, A-2
P.O. Box 1857
La Plata, Maryland 20646
Ph: (301) 934-4366
Fax: (301) 934-1668

Counsel for Plaintiff Bonita M. Brown


_____/s/ *Daniel M. Creekman*_____
Daniel M. Creekman

40