# EXHIBIT

# 2

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

BONITA M. BROWN,                    *

        Plaintiff,              *

                              *

    vs.                         *    CASE NO.:

                              *    1:06-CV-01417 (RWR)

GEORGETOWN UNIVERSITY              *

HOSPITAL,                          *

        Defendant.              *

* * * * * * * * * * * * * * * * * * * * * * * * *

        The deposition of BONITA M. BROWN was

taken on Monday, August 13, 2007, commencing at

10:05 a.m., at the offices of CROWELL & MORING,

LLP., 1001 Pennsylvania Avenue, N.W., Suite 1100,

Washington, D.C., before Cheryl A. Lord, Notary

Public.

* * * * * * * * * * * * * * * * * * * * * * * * *


Reported by:

        Cheryl A. Lord, RPR, CRR

**ORIGINAL**

1    APPEARANCES:

2

3        On behalf of the Plaintiff:

4        REUBEN B. COLLINS II, ESQUIRE

5        COLLINS & TALLEY LLC

6        201 Centennial Street

7        Suite A-2

8        La Plata, Maryland 20646

9        (301) 934-4366

10

11        On behalf of the Defendant:

12        KEITH J. HARRISON, ESQUIRE

13        CROWELL & MORING LLP

14        1001 Pennsylvania Avenue, N.W.

15        Suite 1100

16        Washington, D.C. 20004-2595

17        (202) 624-2920

18

19

20

21

Page 3

1    APPEARANCES (Continued):

2

3    On behalf of MedStar Health:

4    LAUREN M. ROWINSKI, ESQUIRE

5    Senior Corporate Counsel

6    4979 Mercantile Road

7    White Marsh, Maryland 21236

8    (410) 933-3280

9

10

11

12

13

14

15

16

17

18

19

20

21

1  frame you worked at the Washington Hospital Center?

2       A.    I worked at the hospital center for a

3  year.

4       Q.    Which year was it approximately?

5       A.    About '99 to 2000.

6       Q.    And did you work at Providence Hospital

7  immediately before coming to Georgetown?

8       A.    Yes.

9       Q.    And what time frame did you work at

10  Providence Hospital?

11       A.    Right after I left the hospital center.

12  It was only for maybe 2 months.

13       Q.    And why did you leave Providence Hospital

14  to go work at Georgetown University Hospital?

15       A.    I wasn't happy at Providence Hospital.

16       Q.    Why not?

17       A.    I didn't like the care that I had to give

18  and the unit that I was hired for.  I was hired for

19  ICU unit.

20       Q.    Now, you started working at Georgetown

21  University Hospital around March 25th, 2003; is

Page 12

1  that correct?

2       A.   Yes.

3       Q.   And your position there was a clinical

4  technician?

5       A.   Yes, clin tech.

6       Q.   And was that position throughout your

7  employment at Georgetown University Hospital?

8       A.   Yes, sir.

9            MR. HARRISON:  Could I have this marked

10  as exhibit number 1, please.

11            (Whereupon, Brown Deposition Exhibit

12  No. 1 was marked for identification.)

13            BY MR. HARRISON:

14       Q.   Ms. Brown, you've been handed what has

15  been marked as exhibit number 1.

16            It's a job description for a clinical

17  technician.

18            If you could take a moment and review

19  this job description, my only question to you is

20  whether this is a job description for the position

21  you held at Georgetown University Hospital.

Page 13

1       A.   Okay.

2            (Pause.)

3       A.   Yes, sir.

4            BY MR. HARRISON:

5       Q.   Okay.  So this would be a job description

6   for the clinical technician position that you held?

7       A.   Yes.

8       Q.   Okay.  Now, when you began working at

9   Georgetown University Hospital in March of 2003,

10  who was your supervisor, that is, who did you

11  report to?

12      A.   Christine Walsh.

13      Q.   And what was her position?

14      A.   She was the ASE, assistant nurse

15  coordinator.

16      Q.   Can you just generally describe what your

17  responsibilities were as a clinical technician?

18      A.   Monitor vitals, do 12-lead EKGs, start

19  IVs, draw blood.  I'm cross-trained as a unit clerk

20  secretary.  I did stocking on the units.  I prep

21  the units -- I prep rooms for surgery patients,

1    Q.   Now, at about the time of August 19th,

2  2003, was Kathleen -- you said Murto?

3    A.   Yes.

4    Q.   Was she your supervisor?

5    A.   She was covering for Michelle Humphrey.

6    Q.   So Michelle Humphrey was your supervisor

7  at that time?

8    A.   I believe she had accepted a position as

9  ANC at the time, yes.

10    Q.   Let me see.

11        I'm sorry.

12        You said that Michelle Humphrey had

13  accepted a position at NC?

14    A.   ANC.

15    Q.   ANC.

16        And "ANC" stands for assistant nurse

17  coordinator?

18    A.   Yes.

19    Q.   And that would have been the position

20  that Christine Walsh had had previously?

21    A.   Yes.

Page 23

1    A.    No.

2    Q.    Okay.   Then I misunderstood.

3          When did you first meet Ms. Humphrey?

4    A.    When I came back to Georgetown in March

5    of 2003.

6    Q.    When you first came back in March of

7    2003, was Michelle Humphrey your supervisor?

8    A.    No.

9          She was a floor nurse.

10   Q.    So when you first met Ms. Humphrey, she

11   was a floor nurse but not your direct supervisor;

12   is that correct?

13   A.    Correct.

14   Q.    And then at some point, she became your

15   direct supervisor when she became assistant nurse

16   coordinator?

17   A.    Yes.

18   Q.    And what race is Ms. Humphrey?

19   A.    I was told British.

20   Q.    British?

21   A.    Yes.

Page 32

1          BY MR. HARRISON:

2      Q.    Now, deposition exhibit number 6 is a

3    notification of change in work schedule; is that

4    correct?

5      A.    Yes.

6      Q.    Okay.  Now, prior to this change in your

7    work schedule, you had been leaving at I guess 6

8    o'clock AM --

9      A.    Yes.

10     Q.    -- is that correct?

11          And this was an accommodation to you

12   based on some child care needs that you indicated?

13     A.    Yes.

14     Q.    And Ms. Humphrey had adjusted your

15   schedule to accommodate for your child care needs

16   allowing you to leave at 6 o'clock.

17          Correct?

18     A.    No.

19          Christine Walsh had.

20     Q.    Oh, Christine Walsh had.

21     A.    Yes.

Page 33

1    Q.    Okay.  After Ms. Walsh left, Ms. Humphrey

2  continued that schedule?

3    A.    Yes.

4    Q.    Now, were the -- were you the only

5  clinical technician that left at 6 AM?

6    A.    Yes.

7    Q.    And what time did the other clinical

8  technicians leave?

9    A.    I was the only tech.

10    Q.    You were the only tech.  Okay.

11        Deposition exhibit number 6 states that:

12  The reason for the change in your schedule was

13  because C 41 has been saving more beds for our

14  procedure patients who typically start arriving

15  between 6:30 and 7 AM.  These patients need to be

16  prepared for their procedures, which have been left

17  up to nurses until now, as you have been leaving at

18  6 o'clock.  As the number of admissions has been

19  increasing, the nurses need more help with these

20  tasks as well as answering the call lights at this

21  time.  Therefore, this is a unit need.

Page 35

1    be patients who needed to be prepped for their

2    surgical procedures.

3         A.    Yes.

4         Q.    Correct?

5               And do you recall receiving this

6    notification or change in work schedule?

7         A.    Yes.

8         Q.    Now, do you believe that the change in

9    work schedule that's described in deposition

10   exhibit number 6 was discriminatory?

11        A.    Yes.

12        Q.    And why is that?

13        A.    Because she accommodated other techs.

14        Q.    Okay.  When you say, she, you're

15   referring to Michelle Humphrey?

16        A.    Yes.

17        Q.    And which other techs did she

18   accommodate?

19        A.    Reshaun McClemore and Tanya -- I believe

20   her name is Delphries (phonetic).  I know it begins

21   with a D.

1      Q.    Okay.  What's your best guess as to what

2  her last name was?

3      A.    Del- -- Del- -- it's a Jamaican name.

4  Delphries, Delfalphrey.  I can't get it.

5      Q.    And the first -- the other -- the first

6  other tech other than Tanya was -- sorry -- you

7  said there were 2?

8      A.    Reshaun.

9      Q.    Reshaun.

10            And what race was Reshaun?

11     A.    Black.

12     Q.    And Tanya you indicated was Jamaican.

13            Would she also be considered black?

14     A.    Yes.

15     Q.    Do you know Reshaun's country of origin,

16  her national origin?

17     A.    No, I don't.

18     Q.    And how did Ms. Humphrey accommodate --

19  I'll just use the first names -- Reshaun and Tanya?

20     A.    That's what I'm used to, the first names.

21            Allowed Reshaun to come in at 6 and

Page 37

1    allowed Tanya to come in at 5 AM.

2        Q.   And would this have been early -- let me

3    just with regard to coming in at 6 AM, would it

4    have been earlier or later than what you would

5    consider to be a regular schedule?

6        A.   Earlier.

7        Q.   And with regard to Tanya coming in at 5

8    AM, would that have been earlier or later?

9        A.   Earlier.

10           THE WITNESS:  May I use the restroom,

11   please?

12           MR. HARRISON:  Absolutely.

13           Let's take a break.

14           Recess (10:49 a.m.)

15           After Recess (10:52 a.m.)

16           MR. HARRISON:  Okay.  Let's go back on

17   the record.

18           BY MR. HARRISON:

19       Q.   Okay.  Now, Ms. Brown, before the break,

20   we were talking about exhibit number 6, which is a

21   letter dated May the 9th of 2005, regarding

Al Betz & Associates, Inc.
www.albetzreporting.com

Page 40

1      Q.    I'm sorry.

2            May 25th.

3      A.    It happened on May 25th.

4      Q.    It happened on May 25th.  Okay.

5            Describe for me what happened with regard

6   to this incident.

7      A.    The nurse, James Babio, asked me to come

8   into the room and assist him in turning the patient

9   while he listened to his lungs.  The patient was

10   soiled.

11           I explained to the daughters what we were

12   going to do before we turn him, I needed to clean

13   him because he was soiled.  And I explained to the

14   daughter what we was going to do.

15           She asked just to leave him because he

16   was tired.  He had just went through a procedure,

17   and all he needed was care and comfort.  But I

18   couldn't leave the patient like that.  We had to

19   clean the patient.

20           And the patient got -- I mean, not the

21   patient -- I'm sorry -- the daughter got very

Page 48

1   should be involved.

2        Q.   Okay.   Now, I'd like for you to skip the

3   next page and turn to what should be the seventh

4   page of deposition exhibit number 9.   It carries at

5   the bottom Bates stamp ending in 120.   It's dated

6   5-26, and at the top, it says, to whom it may

7   concern.

8             Do you see that reference?

9        A.   Yes, sir.

10       Q.   Is that your statement?

11       A.   Yes.

12       Q.   Your statement of the facts of the

13  incident that occurred on May the 25th, 2005?

14       A.   Yes.

15       Q.   Were you suspended pending the

16  investigation of this incident that occurred on May

17  the 25th, 2005?

18       A.   Yes.

19       Q.   And were you paid for the time that you

20  were suspended?

21       A.   No.

Page 49

1      Q.    You received no pay for the time that you

2  were suspended?

3      A.    Not all of it.

4      Q.    Okay.  And why do you say, not all of it?

5      A.    I don't have my pay stubs to explain to

6  you.  I wasn't paid the full-time that I was out.

7           That's the best I can give.

8      Q.    Now, do you recall being suspended from

9  May 26 through June the 6th?

10     A.    Yes.

11     Q.    And your normal schedule, would you have

12 worked every day between May 26th and June the 6th?

13     A.    No.

14     Q.    On your normal schedule, how many days

15 between May 26 and June the 6th would you have

16 worked?

17     A.    I worked 3 days a week, which was Monday,

18 Tuesday, and Wednesday.

19     Q.    And do you believe you were not paid for

20 3 days?

21     A.    Not on my hourly basis, no, which was 12

1  hours.  I was -- I worked 12 hours.

2       Q.   And you said that your -- you mentioned

3  that you don't have your pay stubs.

4       A.   Right.

5       Q.   Okay.  Would your pay stubs accurately to

6  the best of your knowledge reflect the hours for

7  which you were paid during that suspension?

8       A.   Yes.

9            MR. HARRISON:  Okay.  Let's have this

10 marked as deposition exhibit number 10.

11           (Whereupon, Brown Deposition Exhibit

12 No. 10 was marked for identification.)

13           BY MR. HARRISON:

14      Q.   Ms. Brown, you've been handed what has

15 been marked as deposition exhibit number 10, which

16 is a letter dated August 1st, 2005, from Michelle

17 Humphrey to you, which states:  This represents

18 documentation of a written warning for failing to

19 sign in and out properly on your timesheet.

20           Have I correctly identified the first

21 page of deposition exhibit number 10?

Page 54

1    Q.   And from your perspective, what happened

2   on Wednesday, July 27th?

3    A.   Melody Attah, which was the ASE

4   assistant, she came to the unit and asked me to

5   walk to the office with her, which was about 7:25.

6   And I went around the corner with her.  It's right

7   around the corner from the unit.

8        And Michelle Humphrey walked up behind me

9   and noticed me standing there talking to Melody,

10   which we were discussing about a paper that I

11   needed her to fax over to Sanford Brown.  At the

12   time I was trying to get enrolled at Sanford Brown,

13   and I needed a copy of the sheet that she had faxed

14   over.

15        By that time it was 7:27, and she walked

16   back to the unit with me.

17    Q.   And that's it?

18    A.   Yeah.

19        Michelle Humphrey asked me to meet with

20   her right before I left the office because she

21   wanted to give me an eval, and I told her I didn't

Page 55

1    have time to wait because she scheduled with me on

2    such short notice.

3              And she said, no, I need to speak with

4    you now.  And I said, no.  And she said, I might as

5    well go ahead and meet with you now because you

6    already trying to leave the unit early.

7              I said, Michelle, I don't have time to

8    argue with you right now, I need to get home.

9    Because at that particular time, I needed to pick

10   my kids up from babysitting.  So me and Melody

11   walked back to the unit.

12             So next thing I know, I had got written

13   up for falsifying time.

14       Q.    Melody Attah, that was the person who you

15   were talking to at that time?

16       A.    Yeah.

17             She was the supervisor -- assistant ASE.

18       Q.    So she would have been a witness to all

19   those events of that incident on July 27th?

20       A.    Yes.

21       Q.    Did you ever receive or go over -- let me

Page 56

1    rephrase the question.

2         Did you ever meet with Ms. Humphrey to go

3    over your performance evaluation?

4         A.    No.

5         Q.    And why not?

6         A.    She never gave me notice that she wanted

7    to meet with me about my performance eval.

8         MR. HARRISON:  Let's have this marked as

9    deposition exhibit number 11.

10        (Whereupon, Brown Deposition Exhibit

11   No. 11 was marked for identification.)

12        BY MR. HARRISON:

13        Q.    Deposition exhibit number 11 is a letter

14   dated August 4, 2005, from Ms. Humphrey to Bonita

15   Brown.  And the first of the letter indicates:  On

16   August 1, 2005, I noticed you in writing that I

17   wished to meet with you in the presence of your

18   union delegate on Wednesday, August 3rd, 2005.

19        Have I correctly identified deposition

20   exhibit number 11?

21        A.    Yes.

1      Q.    And have you had an opportunity to review

2  this document?

3      A.    Yes.

4      Q.    The letter states that:  On Wednesday,

5  August 3rd, at approximately 8 o'clock PM, I called

6  you from my office to tell you that I was ready to

7  start the meeting.  You did not report to my office

8  as scheduled.  A short time later, your union

9  delegate, Charles Lawson, stated that you were not

10  going to meet with me.  He restated the same

11  assertion in the presence of the clinical

12  administrator.

13            Do you see that reference?

14      A.    Yes.

15      Q.    Is that accurate?

16            Are those facts accurate?

17      A.    Yes.

18      Q.    How would you describe your relationship

19  with Mr. Lawson?

20      A.    Coworkers.

21      Q.    Did you ever socialize outside the

Page 59

1  from Michelle Humphrey to Bonita Brown, and it

2  indicates that this represents a written warning

3  for gross misconduct.

4          Did I correctly identify at least the

5  first page of deposition exhibit number 12?

6      A.   Yes, sir.

7      Q.   Now, deposition exhibit number 12 also

8  refers to some events that occurred on August 17,

9  2005.

10         According to this letter, it says that

11 you refused twice to follow my -- meaning

12 Ms. Humphrey's -- instructions to report to my

13 office to meet with me.

14         Do you see that reference --

15     A.   Yes.

16     Q.   -- in the letter?

17         And do you recall these circumstances on

18 August 17, 2005?

19     A.   Yes, sir.

20     Q.   And did you refuse twice to follow

21 Ms. Humphrey's instructions to report to her office

Page 60

1   and meet with her?

2        A.   I refused 3 times.

3        Q.   3 times?

4        A.   Yes, sir.

5        Q.   Okay.  And why did you refuse 3 times to

6   report -- to meet with Ms. Humphrey on August 17,

7   2005?

8        A.   This was a surprise meeting with

9   Ms. Humphrey.  I wasn't aware of this meeting.

10            And I was in the middle of doing patient

11  care at the time that she called.  And I asked her,

12  what was this meeting about.  She refused to tell

13  me.

14       Q.   So did you meet with her on August 17th

15  at any time?

16       A.   Only when they escorted me out.

17       Q.   And you refused to meet with her you said

18  3 times.

19            Over what time period did you refuse

20  these 3 requests?

21       A.   In the same conversation as I was asking

Page 61

1   her, what is this about, and she said, I'm not

2   going to tell you.

3           I said, well, I'm not coming.  I said,

4   can you tell me what this meeting is about.  She

5   said, I'm got going to tell you.  I said, I'm not

6   coming.

7           For the last time I asked her, Michelle,

8   what is this about, I'm in the middle of doing

9   patient care.  She said, I'm not going to tell you.

10  She said, are you being insubordinate.

11          I said, well, yes, if you want to put it

12  that way.  She said, okay.  She hung the phone up.

13      Q.   So this is a telephone conversation?

14      A.   Yes.

15      Q.   Did Ms. Humphrey indicate to you that

16  that was not going to be a disciplinary action and

17  therefore you did not need a union representative?

18      A.   No.

19           She denied me a union rep.

20      Q.   She denied you a union rep?

21      A.   Yes.

Page 69

1          BY MR. HARRISON:

2          Q.    Ms. Brown, you've been handed what has

3     been marked as deposition exhibit number 15, which

4     appears to be a family medical leave application

5     filled out by -- well, pertaining to you; is that

6     correct?

7          A.    Yes.

8          Q.    And according to the duration of the

9     leave, it was originally scheduled to begin on

10    August 22nd of 2005 and end on October 31st of

11    2005; is that correct?

12         A.    Yes, sir.

13         Q.    Now, what was the purpose for which you

14    took the family medical leave?

15         A.    Because I was hospitalized.

16         Q.    And what condition caused you to be

17    hospitalized?

18         A.    Unstable angina.

19         Q.    And do you recall how long you were

20    hospitalized for?

21         A.    A week.

Page 70

```
 1      Q.    And where were you hospitalized?

 2      A.    Southern Maryland Hospital.

 3      Q.    I'm sorry?

 4            Southern Maryland?

 5      A.    Southern Maryland Hospital, Clinton,

 6  Maryland.

 7      Q.    When was the first time that a physician

 8  informed you that you had any sort of angina?

 9      A.    When I was in ER.

10      Q.    When was that?

11      A.    August 18th.

12      Q.    And what date had been your -- when had

13  you last been at work prior to August 18th?

14      A.    August 17th.

15      Q.    Now, you did extend your family medical

16  leave past October 31st, 2005?

17      A.    Yes.

18      Q.    And did you extend it through November

19  7th, 2005?

20      A.    No.

21            It was till the 14th.
```

Al Betz & Associates, Inc.
www.albetzreporting.com

1      Q.   Till the 14th?

2      A.   Yes.

3      Q.   And the 14th was the date that you

4   submitted your resignation letter.

5           Correct?

6      A.   Yes, sir.

7           MR. HARRISON:   Okay.   Let's have this

8   marked as deposition exhibit number 16.

9           (Whereupon, Brown Deposition Exhibit No.

10   16 was marked for identification.)

11          MR. HARRISON:   For the record, deposition

12   exhibit number 16 is a letter dated November 4,

13   2005, to Ms. Brown from Sonja Gaithers.

14          BY MR. HARRISON:

15     Q.   Ms. Brown, do you recall informing

16   Ms. Gaithers that you had canceled your return to

17   work appointment due to a new medical condition,

18   that you would be requesting additional time off?

19     A.   Yes.

20     Q.   Okay.   And what was the new medical

21   condition?

Page 72

1      A.    I had fell and injured my leg.

2      Q.    And where did you fall?

3            What was the location of your accident?

4      A.    In the kitchen.

5      Q.    At your home?

6      A.    Yes.

7      Q.    Now, during the time that you were on

8  family medical leave, did you obtain employment at

9  another -- did you obtain other employment?

10     A.    Yes.

11     Q.    And where did you obtain that other

12 employment?

13     A.    Charlotte Hall Veterans Home Assisted

14 Living.

15     Q.    I'm sorry.

16           Could you repeat that?

17     A.    Charlotte Hall Veterans Home Assisted

18 Living.

19     Q.    When did you start working --

20     A.    October 10th --

21     Q.    -- at that place?

Page 73

1              October 10th?

2       A.    -- 2005.

3       Q.    So you had been working at that home for

4    some time while you were employed at --

5       A.    Yes.

6       Q.    -- Georgetown?

7       A.    Yes.

8       Q.    And you continued to work at the veterans

9    home during the time of FMLA leave?

10      A.    Yes.

11      Q.    And did you miss any time from your work

12   at the veterans home?

13      A.    No.

14      Q.    And what was your position at the

15   veterans home?

16      A.    I'm a CNA, Certified Nursing Assistant.

17      Q.    And do you continue to be employed at

18   that veterans home?

19      A.    Yes.

20      Q.    And when you started working in October

21   of 2005, what days did you work?

Page 74

1       A.    Monday through Friday.

2       Q.    And how many hours did you work?

3       A.    7.5.

4       Q.    And did you work -- when you say, Monday

5    through Friday, did you work every day?

6       A.    Yeah.

7       Q.    And so you worked 7.5 hours each day?

8       A.    Yes, sir.

9       Q.    Now, during the time that you were

10   hospitalized at Southern Maryland Hospital, did you

11   miss work at the veterans home?

12      A.    I wasn't working there then.

13      Q.    You weren't working there then.

14            When did you stop working at the veterans

15   home?

16      A.    When did I stop or start?

17      Q.    Let me see here.  Okay.

18            I'm sorry.

19            Did you continue to work 5 days a week,

20   7.5 hours a day after you had injured your leg when

21   you fell in your kitchen?

Page 75

1    A.    No.

2    Q.    Okay.  Did you take time off from work at

3    the veterans home when you fell and injured your

4    leg?

5    A.    Only 2 days.

6    Q.    And what was your rate of pay at the

7    veterans home?

8    A.    11 05.

9    Q.    And that would be per hour?

10    A.    Yes, sir.

11    Q.    And did you work any overtime?

12    A.    Later in the months like around December,

13    I started doing overtime.

14    Q.    What was your rate of pay at the

15    Georgetown University Hospital?

16    A.    When I left Georgetown, night shift, I

17    believe it was 16 08.

18    Q.    Ms. Brown, with regards to FMLA leave,

19    did you use paid time off for that leave, or was it

20    unpaid leave?

21    A.    I didn't get paid FMLA.

Page 76

1    Q.    Now, you started work at the veterans

2  home on October 10, 2005.

3          At that time, you could have returned to

4  work at Georgetown University Hospital.

5          Correct?

6    A.    I could have, yes.

7    Q.    But you chose not to.

8          Correct?

9    A.    Yes.

10   Q.    Now, I believe you indicated that during

11 the entire time that you were employed at

12 Georgetown University Hospital, you were a member

13 of SEIU; is that correct?

14   A.    Yes.

15         MR. HARRISON:  Let's have this marked as

16 the next deposition exhibit.

17         (Whereupon, Brown Deposition Exhibit No.

18 17 was marked for identification.)

19         BY MR. HARRISON:

20   Q.    Ms. Brown, looking at what has been

21 marked as deposition exhibit number 17, I guess my

Page 77

1   first question is, have you ever seen the agreement

2   Georgetown University and SEIU?

3       A.   Yes.

4       Q.   And does deposition exhibit number 17

5   appear to be the contract between Georgetown

6   University Hospital and district 1199 E, D.C.

7   Health Care Workers Union SEIU?

8       A.   Yes.

9       Q.   Now, with regard to your employment and

10  your -- your employment at Georgetown University

11  Hospital, that hospital is located in the District

12  of Columbia.

13          Correct?

14      A.   Yes.

15      Q.   And you've made allegations about a

16  number of facts and circumstances in this lawsuit.

17          Would all of those facts and

18  circumstances you've alleged in this lawsuit have

19  occurred in the District of Columbia?

20      A.   Yes.

21      Q.   And they would have all occurred at

Page 78

1   Georgetown University Hospital.

2          Right?

3      A.   Yes, sir.

4      Q.   Now, you filed a charge of discrimination

5   with the Equal Employment Opportunity Commission?

6      A.   Yes, sir.

7          MR. HARRISON:  Let's have this marked as

8   deposition exhibit number 18.

9          (Whereupon, Brown Deposition Exhibit

10  No. 18 was marked for identification.)

11         MR. HARRISON:  For the record, deposition

12  exhibit number 18 is a multi-paged exhibit.  The

13  first page says at the top, Equal Employment

14  Opportunity Commission.  It's addressed to Mary Jo

15  Schweickhardt -- and I'll spell that for you --

16  S-C-H-W-E-I-C-K-H-A-R-D-T.

17         And that first page states, notice of

18  charge of discrimination, and it's dated November

19  18th, 2005.

20         BY MR. HARRISON:

21     Q.   Ms. Brown, have I correctly just

1  generally identified the first page of deposition

2  exhibit number 18?

3      A.   Yes.

4           I'm sorry.

5           Yes.

6      Q.   That's okay.

7           Now, I'd like to direct your attention to

8  the last page of that deposition exhibit, and that

9  should be a charge of discrimination with your name

10  at the top, Bonita Brown, and a date of August 1st,

11  2005, with a signature at the bottom.

12           Is that the document -- is that the page

13  that you have in front of you?

14      A.   Yes, sir.

15      Q.   Is that the charge of discrimination that

16  you filed with regard to Georgetown University

17  Hospital?

18      A.   Yes, sir.

19      Q.   And that's your signature at the bottom?

20      A.   Yes, sir.

21      Q.   With regard to cause of discrimination

Page 80

1    based on -- do you see that box that's almost in

2    the middle of the last page of deposition exhibit

3    number 18?

4              It says, cause of discrimination based

5    on.

6        A.   Yes, sir.

7        Q.   And there's a check next to, national

8    origin; is that correct?

9        A.   Yes, sir.

10       Q.   And then there's a description below

11   that.

12             It says, the particulars are, and there's

13   a description of what's identified as harassment;

14   is that correct?

15       A.   Yes, sir.

16       Q.   And essentially, in your charge of

17   discrimination, you state that during your

18   employment there, and especially during the last 6

19   months, your supervisor, Ms. Humphrey, who is

20   identified as British, has harassed me.

21             Do you see that reference?

1    were, however, she never even acknowledged me.

2         Do you see that reference?

3    A.    Yes.

4    Q.    And it goes on in your charge to say:

5    Towards the end of the meeting, she remarked, it's

6    a cultural thing.

7         And you state in your charge:  I felt

8    this was a very degrading remark, and it was

9    insulting to me as an African American.

10        Do you see that reference?

11   A.    Yes.

12   Q.    And this says:  The other attendees

13   attending the meeting were foreigners.

14        Now, Ms. Humphrey's statement that it's a

15   cultural thing, during this meeting, why did you

16   feel that was a degrading remark?

17   A.    It was insulting.  I felt she had

18   something against me as a black American.

19   Q.    You said the others -- in your charge,

20   you say:  The others attending the meeting were

21   foreigners.

Page 84

1    Ms. Humphrey?

2         A.    About 5.

3         Q.    Do you recall who they were?

4         A.    Evelyn Fisher, Praxedes FoFung, Melody

5    Attah, James Babio, and Rino Alcantara.

6         Q.    Do you recall what concerns were

7    expressed by the nurses at the meeting?

8         A.    They were speaking on how unit clerks and

9    other clin tech workers from other units were

10   better than the ones on C 41.

11        Q.    Would it be fair to say that the

12   discussion was generally about teamwork and

13   communication with that unit?

14        A.    Yes.

15        Q.    And were there concerns expressed that

16   there was less teamwork and communication on that

17   unit than there were on other units?

18        A.    Yes.

19        Q.    And was that what Ms. Humphrey was

20   referring to when she said, it's a cultural thing,

21   the communication between and among the people that

Page 85

1    are on the unit?

2        A.    Yes.

3              THE WITNESS:   May I use the bathroom?

4              MR. HARRISON:   Yes.

5              BY MR. HARRISON:

6        Q.    I just have one more question.

7        A.    Okay.

8        Q.    Would it be accurate to say that there

9    were a number of different cultures -- that the

10   people on the unit came from a number of different

11   cultures?

12       A.    Yes.

13             MR. HARRISON:   Okay.  Let's take a break.

14             Recess (12:14 p.m.)

15             After Recess (12:19 p.m.)

16             MR. HARRISON:   Okay.  Let's go back on

17   the record.

18             BY MR. HARRISON:

19       Q.    Ms. Brown, before the break, we were

20   discussing a meeting on May 25th, 2005, in which

21   there were some discussions among the staff with

Page 86

1    regard to communication and teamwork issues on the

2    unit.

3              Do you recall --

4        A.   Yes.

5        Q.   -- we were discussing that?

6              Now, did you share those concerns that

7    communication could improve and teamwork could

8    improve on the unit?

9        A.   No.

10       Q.   You thought it was perfect?

11       A.   I just sat and listened.

12       Q.   Okay.  So you didn't express any opinion?

13       A.   No, sir.

14       Q.   Did you have any opinion as to whether

15   communication could improve among the workers on

16   the staff in the unit?

17       A.   No.

18       Q.   And to your understanding, when

19   Ms. Humphrey used the term it's a cultural thing,

20   was she referring to the concerns that had been

21   expressed about lack of communication on the staff

Page 87

1  comprised of people from all different places?

2      A.    Yes.

3      Q.    Now, your charge goes on to say that on

4  May 25th, 2005 -- and it says:  I was called to

5  work as a secretary on the 3 o'clock PM to 11

6  o'clock PM shift.  A technician, Victoria, asked me

7  to assist another technician when transferring a

8  patient back to bed.  I refused because I was

9  working as a secretary because I had had some prior

10 difficulty with the patient's family.  Even though

11 the clinical in charge agreed with my reasoning, I

12 was still suspended with pay from May 26, 2005, to

13 June 6, 2005.

14          Do you see that reference?

15     A.    Yes, sir.

16     Q.    Is that referring to the incident that we

17 discussed early in your testimony concerning moving

18 the patient that had been soiled and the family got

19 upset?

20     A.    Yes, sir.

21     Q.    Okay.  Now, in this statement, in your

```
 1      A.   No.

 2           With me working as a secretary was on the

 3 26th.

 4      Q.   Yes.

 5           Okay.  So just to make sure I understand.

 6      A.   Okay.

 7      Q.   On the 25th, you had the incident

 8 occurred with regard to you turning a patient?

 9      A.   Yes, sir.

10      Q.   And the next day, which would have been

11 the 26th, you were working as a secretary and asked

12 to assist and you refused because of the prior

13 incident?

14      A.   Yes, and knowing that I was working as a

15 secretary.

16           When you work as a secretary, you're not

17 allowed to enter the rooms.

18      Q.   All right.  Now, on -- with regard to

19 your May 25th and 26th work, did these incidents

20 both happen on the same shift?

21           Were you working a 12-hour shift?
```

Page 90

1    A.    No.

2    Q.    No?

3          Since you were called back in, had you

4    finished one shift, then you were called back in?

5    A.    Yes.

6    Q.    Okay.  Now, with regard to the incident

7    described in your charge of discrimination on

8    May -- well, it's described as May the 25th, but

9    it's your testimony that that date is incorrect and

10   this incident actually occurred on May the 28th; is

11   that correct?

12   A.    Correct.

13   Q.    So with regard to the incident that

14   occurred on May 26th, which is described in your

15   charge, why do you believe that that incident had

16   something to do with your national origin being

17   American?

18   A.    I can't answer that.

19   Q.    All right.  Now, I believe you indicated

20   that you submitted a letter of resignation -- or

21   you testified you submitted a letter of resignation

Page 91

1    on November 14th, 2005.

2         A.    Yes.

3              MR. HARRISON:    I'd like to have this

4    marked as deposition exhibit number 19.

5              (Whereupon, Brown Deposition Exhibit

6    No. 19 was marked for identification.)

7              MR. HARRISON:    Before you hand her

8    exhibit number 19 --

9              BY MR. HARRISON:

10        Q.    With regard to exhibit number 18 that you

11   have in front of you, your charge of

12   discrimination, as you sit here, do you have any

13   basis to say that the incident that you describe in

14   your charge that occurred on May 26th with regard

15   to your refusal to aid in -- aid with a patient, do

16   you have any basis as you sit here today to believe

17   that that was based upon you being an American?

18        A.    Yes.

19        Q.    What is that basis?

20        A.    Being an African American, I just felt

21   they were just picking at me.  Even though the

Page 92

1    clinical agreed, I was still suspended.

2        Q.    And were you suspended because of what

3    happened on the 26th or what happened on the 25th

4    with regard to the patient in the room?

5        A.    Both.

6        Q.    And the incident with regard to the

7    patient in the room that occurred on the 25th is

8    not referred to in your charge of discrimination,

9    is it?

10       A.    Yes.

11             It's the same patient.

12             That's what you're asking me.

13             Right?

14       Q.    Well, no.

15             I'm asking, with regard to the

16   testimony -- well, with regard to the incident that

17   occurred in the room as opposed to your being

18   called back on a separate shift.

19       A.    Right.

20       Q.    The first incident --

21       A.    Okay.

Page 95

1     Q.   So do you recall approximately what time

2  during your shift on the 26th you were asked to

3  assist in transferring the patient back to the bed?

4     A.   Around 5 o'clock, 5:10.

5     Q.   That would have been in the afternoon?

6     A.   Yes, sir.

7     Q.   So within about 24 hours, there had been

8  2 complaints lodged with regard to your activities,

9  one by the family, and then one by I guess

10  Ms. Thomas?

11     A.   Yes.

12     Q.   And those 2 complaints resulted in your

13  suspension --

14     A.   Yes.

15     Q.   -- with pay?

16     A.   Yes.

17     Q.   Now, let's take a look at what has been

18  marked as deposition exhibit number 19.

19        And what is deposition exhibit number 19,

20  Ms. Brown?

21     A.   My resignation letter to Sonja Gaithers.

Page 96

1    Q.    And that's your signature on the second

2  page of deposition exhibit number 19?

3    A.    Yes, sir.

4    Q.    And you resigned your employment

5  effective November 14, 2005, by this letter?

6    A.    Yes.

7         MR. HARRISON:  Let's have this marked as

8  deposition exhibit number 20.

9         (Whereupon, Brown Deposition Exhibit

10  No. 20 was marked for identification.)

11         BY MR. HARRISON:

12    Q.    Ms. Brown, before we get to your

13  complaint, I'd like to take you back to your

14  discussion about a meeting which occurred in which

15  there was a staff meeting and there was discussion

16  of communication and teamwork.

17         Do you recall the meeting I'm referring

18  to?

19    A.    Yes, sir.

20    Q.    In which Ms. Humphrey made the statement,

21  it's a cultural thing.

Page 113

1    testimony that Ms. Humphrey was from London.

2          But isn't Ms. Humphrey also black?

3    A.   I guess.  I don't know.

4    Q.   And is there anyone else that you believe

5    discriminated against you based on your race?

6    A.   No, just Michelle Humphrey.

7    Q.   And with regard to discrimination based

8    on national origin, who do you believe

9    discriminated against you based on your national

10   origin?

11   A.   Michelle Humphrey.

12   Q.   Is there anyone else who you believe --

13   A.   No, sir.

14   Q.   -- based on your national origin --

15        Sorry.

16        You have to wait for me to finish.

17   A.   Oh, I'm sorry.

18   Q.   I know you know what I'm going to say,

19   but it makes it easier for the court reporter to

20   get it all down.

21        I probably asked you this earlier, but

Page 114

1    your national origin is the United States of

2    America?

3         A.    Yes, sir.

4         Q.    Now, paragraph 31 also says that the

5    hospital willfully terminated your position.

6              Do you see that reference?

7         A.    Yes, sir.

8         Q.    Okay.  But you submitted a letter of

9    resignation, didn't you?

10        A.    Yes.

11        Q.    Now, paragraph 31 also says that there

12   was an act of retaliation.

13             What do you believe to be an act of

14   retaliation?

15        A.    Ms. Humphrey was trying to get rid of me

16   because of her personal issues.

17        Q.    Okay.  And what were her personal issues?

18        A.    I believe she was having an affair with

19   her husband.

20        Q.    I'm sorry.

21             Had an affair with her husband?

Page 115

1      A.    I mean, with her ex-boyfriend.

2            I'm sorry.

3            And that's the reason why she had called

4   me at home to ask me about the malicious gossip.

5   She had a break-in into her home right after her

6   husband had went overseas and she needed a lock put

7   on her door, and her ex-boyfriend apparently is in

8   that line of work, and she called me to let me know

9   that she had used my name, because his wife was

10  "Bonita" also.

11           She told her husband that my husband was

12  the one that put the lock on the door, because she

13  could not let him know that it was her

14  ex-boyfriend.

15     Q.    And that's why you believe Ms. Humphrey

16  was trying to get rid of you?

17     A.    Yes, sir.

18           And I asked her, what am I going to do

19  when he come home, how am I going to explain this

20  to him that I'm not married.  She said, we'll cross

21  that bridge when we get to it, a woman has got to

Page 116

1   do what a woman has got to do.

2       Q.   Now, based on what you described, it

3   sounds like the real reason that Ms. Humphrey was

4   trying -- was taking these actions that you're

5   complaining about is because of this affair with

6   her ex-boyfriend.

7       A.   Yes, sir.

8       Q.   Now, on page 7 of the complaint,

9   paragraph 41, paragraph 41 states:  Plaintiff's

10  termination was wrongful without any causes

11  whatsoever in that it resulted solely from

12  Ms. Brown's participation in a protected activity.

13           Is the protected activity you're

14  referring to in the complaint the affair

15  circumstances with the ex-boyfriend?

16      A.   Yes, sir.

17      Q.   Now, on that same page, paragraph 44, it

18  indicates that you entered into -- well, I'll just

19  read it:  On or about March 2003, plaintiff was

20  hired as an employee with defendant Georgetown

21  University Hospital and entered into an agreement

1    of employment.

2            Do you see that reference?

3        A.    Yes, sir.

4        Q.    All right.  Now, we took a look at the

5    union contract, the SEIU union contract.

6            Is that the employment agreement to which

7    you're referring?

8        A.    Yes.

9        Q.    All right.  Now, your last count of your

10   complaint refers to intentional infliction of

11   emotional distress, and paragraph 47 of the

12   complaint indicates that on August 17, 2006,

13   plaintiff was forcibly escorted off the Georgetown

14   University Hospital premises without explanation or

15   paperwork.

16            That's the same event that we discussed

17   earlier in your testimony where there was a refusal

18   to meet with Ms. Humphrey, and then subsequently

19   the security guards escorted you off the premise;

20   is that correct?

21       A.    Yes, sir.

1      Q.    Okay.  Now, paragraph 47 -- the date is

2    2006.

3            Is that a typo?

4            Should that have been 2005?

5      A.    2005.  Yes, it's an error in typing.

6      Q.    Now, let me just think of how to ask this

7    question, because I don't want it to be confusing.

8            The discussions that you had with

9    Ms. Humphrey in which she asked you to attend the

10   meeting and you refused to attend a meeting, and

11   the subsequent escorting of you off of the premises

12   by hospital security, that was all in the context

13   of your employment relationship with the

14   university -- with Georgetown University Hospital.

15           Correct?

16     A.    Yes, sir.

17     Q.    Now, the next paragraph refers to your

18   being admitted to Southern Maryland Hospital

19   suffering from a heart condition known as angina.

20           Do you see that reference?

21     A.    Yes, sir.

Page 126

1    in checking the patient's ID band?

2         A.    Lauren Stranger -- Stringer (phonetic).

3         Q.    By the way, Colleen Brown, do you know

4    what her national origin is?

5         A.    Caucasian.

6         Q.    And as far as you know, is she from the

7    United States?

8         A.    No.

9               I don't know that.

10         Q.    So you don't know her nation of origin?

11         A.    No, sir, I don't.

12         Q.    Okay.   Lauren Stringer (phonetic) is the

13    nurse you're referring to in paragraph 16?

14         A.    Yes.

15         Q.    And do you know what her race is?

16         A.    Caucasian.

17         Q.    Do you know what her national origin is?

18         A.    She has stated that she's from Dominican

19    Republic.

20         Q.    And you believe she's Caucasian?

21         A.    Yes.